**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE:  TESTOSTERONE REPLACEMENT | ) | |
| THERAPY PRODUCTS LIABILITY | ) | |
| LITIGATION | ) | Case No. 1:14-cv-1748 |
| | ) | MDL No. 2545 |
| This Document Relates To: | ) | |
| | ) | |
| *Holtsclaw v. Endo Pharmaceuticals, Inc., et al.* | ) | |
| Case No. 1:15-cv-3941 | ) | |
| | ) | |
| *Owens v. Auxilium Pharmaceuticals, Inc.* | ) | |
| Case No. 1:14-cv-5180 | ) | |

**DEFENDANTS' MOTION AND MEMORANDUM OF LAW IN SUPPORT OF MOTION
TO EXCLUDE EXPERT TESTIMONY UNDER FEDERAL RULES OF EVIDENCE 702
AND 403**

Andrew K. Solow (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
25O West 55th Street
New York, NY 10019-9710
Phone:  (212) 836-7740
Fax:  (212) 836-6776
Email:  andrew.solow@apks.com

Pamela J. Yates (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844
Phone:  (213) 243-4178
Fax:  (213) 243-4199
Email:  pamela.yates@apks.com

***Attorneys for Endo Pharmaceuticals Inc.,
Auxilium Pharmaceuticals, LLC (f/k/a Auxilium
Pharmaceuticals, Inc.), and GlaxoSmithKline
LLC***

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT ............................................................................................................................. 4

I. THE COURT SHOULD EXCLUDE DR. ARDEHALI'S SPECIFIC CAUSATION
OPINION THAT TESTIM CAUSED MR. HOLTSCLAW'S HEART ATTACK ........... 5

    A. Mr. Holtsclaw Must Establish Through Expert Testimony that Testim Was
a Substantial Factor in Causing His Heart Attack ................................................. 6

    B. Dr. Ardehali's Specific Causation Opinion Should be Excluded Because He
Fails to Offer a Reasonable Basis for Concluding that Mr. Holtsclaw's Pre-
Existing Medical Conditions Were Not the Sole Cause of His Heart Attack ........ 7

II. THE COURT SHOULD EXCLUDE DR. ABBAS'S CAUSATION OPINION
THAT TESTIM CAN AND DID CAUSE MR. OWENS'S DVT .................................. 11

    A. Dr. Abbas Fails to Offer Any Reliable Specific Causation Theory
Independent of his General Causation Theory ...................................................... 12

    B. Dr. Abbas's Specific Causation Opinion Does Not Account for Critical
Facts Relating to Mr. Owens's Testim Use .......................................................... 15

    C. Dr. Abbas's Specific Causation Testimony Should be Excluded Because He
Cherry-Picked Evidence to Support a Preconceived Conclusion ......................... 19

III. THE COURT SHOULD EXCLUDE THE CAUSATION TESTIMONY
OFFERED BY DR. ARDEL CAGATA AND DR. MARTIN OZOR ............................ 23

    A. Dr. Cagata's Causation Testimony is Inadmissible ............................................. 24

    B. Dr. Ozor's Causation Testimony is Inadmissible ................................................ 25

IV. THE COURT SHOULD EXCLUDE DR. DAVID J. HANDELSMAN'S
OPINIONS CONCERNING DISEASE MONGERING AND MARKETING .............. 25

    A. The Court Should Exclude Dr. Handelsman's Opinions Concerning Disease
Mongering ............................................................................................................. 26

    B. The Court Should Exclude Dr. Handelsman's Marketing Opinions ................... 26

        1. Dr. Handelsman's Marketing Opinions Would Not Assist the Trier
of Fact ....................................................................................................... 27

2.    Dr. Handelsman's Marketing Opinions Do Not Fit the Facts of the Case ......................................................................................................... 29

      a.    There is No Evidence that Plaintiffs or Their Prescribing Doctors Relied on any of the Marketing Materials that Dr. Handelsman Reviewed ...................................................................... 29

      b.    "Pharmaceutical Industry" Marketing and Promotion is Irrelevant ...................................................................................... 31

C.    The Court Should Exclude Dr. Handelsman's Speculation About the Intent of FDA or Auxilium ........................................................................................ 32

D.    The Court Should Preclude Dr. Handelsman from Offering Opinions in Pejorative Terms .................................................................................................. 34

V.    THE COURT SHOULD EXCLUDE DR. PEGGY PENCE'S MARKETING OPINIONS .......................................................................................................................... 34

A.    The Court Should Exclude Dr. Pence's Speculation About Auxilium's Intent ...................................................................................................................... 35

B.    The Court Should Exclude Dr. Pence's Marketing Opinions as Irrelevant Because There is No Evidence that Auxilium's Marketing Materials Influenced Plaintiffs or Their Prescribing Physicians .......................................... 37

C.    The Court Should Exclude Dr. Pence's Speculation Regarding FDA's Reasons for Acting or Not Acting ....................................................................... 38

VI.    THE COURT SHOULD EXCLUDE DR. STEVEN WOLOSHIN'S OPINIONS .......... 38

CONCLUSION ........................................................................................................................... 40

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adams v. Cooper Indus., Inc.*,
  Civil Action No. 03-476-JBC, 2012 WL 2339741 (E.D. Ky. June 19, 2012)........................11

*Black v. Food Lion, Inc.*,
  171 F.3d 308 (5th Cir. 1999) ......................................................................................13

*Brown v. Burlington N. Santa Fe Ry. Co.*,
  765 F.3d 765 (7th Cir. 2014) ......................................................................................7

*Buckman v. Plaintiffs' Legal Comm.*,
  531 U.S. 341 (2001)..................................................................................................36

*C.W. ex rel. Wood v. Textron, Inc.*,
  807 F.2d 827 (7th Cir. 2015) ......................................................................................6

*Carter v. Danek Med., Inc.*,
  No. CIV. 96-3243-G, 1999 WL 33537317 (W.D. Tenn. June 3, 1999) ..................................30

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993)............................................................................................ *passim*

*Ervin v. Johnson & Johnson, Inc.*,
  492 F.3d 901 (7th Cir. 2007) ......................................................................................13

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997)..............................................................................................3, 24

*Guinn v. AstraZeneca Pharm. LP*,
  602 F.3d 1245 (11th Cir. 2010) ................................................................................7, 10

*Haller v. AstraZeneca Pharm. LP*,
  598 F. Supp. 2d 1271 (M.D. Fla. 2009) ......................................................................14, 15

*Hines v. Wyeth*,
  No. 2:04-CV-0690, 2011 WL 2680834 (S.D. W. Va. July 8, 2011) ..................................3, 30

*In re Air Crash Disaster at New Orleans, La.*,
  795 F.2d 1230 (5th Cir. 1986) ....................................................................................28

*In re Bextra & Celebrex Mktg. Sales Practices & Prods. Liab. Litig.*,
  524 F. Supp. 2d 1166 (N.D. Cal. 2007) ........................................................................23

iii

*In re C.R. Bard, Inc.*,
    948 F. Supp. 2d 589 (S.D. W. Va. 2013) ..................................................................33

*In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab.
    Litig.*,
    No. MDL 1203, 2000 WL 876900 (E.D. Pa. June 20, 2000) ....................................33

*In re Fosamax Prods. Liab. Litig.*,
    645 F. Supp. 2d 164 (S.D.N.Y. 2009)......................................................................33

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig.*,
    174 F. Supp. 3d 911, 930 (D.S.C. 2016).................................................................23

*In re Rezulin Prods. Liab. Litig.*,
    309 F. Supp. 2d 531 (S.D.N.Y. 2004).......................................................................33

*In re Rezulin Prods. Liab. Litig.*,
    369 F. Supp. 2d 398 (S.D.N.Y. 2005).......................................................................23

*In re Testosterone Replacement Therapy Prods. Liab. Litig.*,
    No. 14 C 1748, 2017 WL 1833173 (N.D. Ill. May 8, 2017) ......................... *passim*

*In re Testosterone Replacement Therapy Prods. Liab. Litig.*,
    No. 14 C 1748, 2017 WL 1836443 (N.D. Ill. May 8, 2017) ......................... *passim*

*In re Trasylol Prods. Liab. Litig.*,
    No. 08-MD-01928, 2010 WL 4052141 (S.D. Fla. May 12, 2010) ...........................33

*In re Viagra Prods. Liab. Litig.*,
    658 F. Supp. 2d 950 (D. Minn. 2009).......................................................................30

*In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*,
    26 F. Supp. 3d 449, 459–60 (E.D. Pa. 2014) ..........................................................23

*Jackson v. Ford Motor Co.*,
    842 F.3d 902 (6th Cir. 2016) ....................................................................................6

*Johnson v. Memphis Light, Gas & Water Div.*,
    No. 2:12-cv-02664-STA-tmp, 2016 WL 1249614 (W.D. Tenn. Mar. 28, 2016) ...................11

*Kelley v. Am. Heyer-Schulte Corp.*,
    957 F. Supp. 873 (W.D. Tex. 1997).................................................................10, 11

*McClain v. Metabolife Int'l, Inc.*,
    401 F.3d 1233 (11th Cir. 2005) ..........................................................................13, 17

*Miller v. Pfizer, Inc.*,
    196 F. Supp. 2d 1095 (D. Kan. 2002), *aff'd*, 356 F.3d 1326 (10th Cir. 2004) ......................30

*Myers v. Ill. Cent. R.R. Co.*
    629 F.3d 639 (7th Cir. 2010) ................................................................................4

*Nozinich v. Johnson & Johnson, Inc.*,
    No. 09-02015 DKV, 2011 WL 13124085 (W.D. Tenn. July 6, 2011) .....................................6

*Pathways, Inc. v. Hammon*,
    113 S.W.3d 85 (Ky. 2003) ................................................................................11

*Prather v. Abbot Labs.*,
    960 F. Supp. 2d 700 (W.D. Ky. 2013) ..................................................................30

*Salem v. U.S. Lines Co.*,
    370 U.S. 31 (1962)..........................................................................................37

*Scharff v. Wyeth*,
    No. 2:10-CV-220-WKW, 2011 WL 4361634 (M.D. Ala. Sept. 19, 2011) ............................30

*Schultz v. Akzo Nobel Paints, LLC*,
    721 F.3d 426 (7th Cir. 2013) ............................................................................7

*Tamraz v. Lincoln Elec. Co.*,
    620 F.3d 665 (6th Cir. 2010) .......................................................................11, 24

*Tyree v. Bos. Sci. Corp.*,
    54 F. Supp. 3d 501, 520–21 (S.D. W. Va. 2014)...................................................23

**Rules**

Fed. R. Evid. 403 ....................................................................................... *passim*

Fed. R. Evid. 702 ....................................................................................... *passim*

## PRELIMINARY STATEMENT

The principles governing the admissibility of expert testimony under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) are well-established and set forth in this Court's opinions in the AbbVie bellwether cases. *See In re Testosterone Replacement Therapy Prods. Liab. Litig.*, No. 14 C 1748, 2017 WL 1833173, at *5–6 (N.D. Ill. May 8, 2017) ("CMO 46"); *In re Testosterone Replacement Therapy Prods. Liab. Litig.*, No. 14 C 1748, 2017 WL 1836443, at *12–13 (N.D. Ill. May 8, 2017) ("CMO 48"). Plaintiffs cannot satisfy their burden to show that the following of their experts' opinions are admissible:

**Dr. Hossein Ardehali** - Dr. Ardehali opines that Testim caused Plaintiff Steven D. Holtsclaw's heart attack. The Court should exclude his opinion because he fails to "provide a reliable basis for concluding that [Testim] was a 'substantial factor' in the development of [Mr. Holtsclaw's heart attack] and that other potential causes are unlikely to have been the injury's sole cause." CMO 46, at *17. In particular, he concedes that a man of the same age with the same preexisting risk factors for cardiovascular disease as Mr. Holtsclaw, but who was not using a testosterone replacement therapy ("TRT") medicine, could suffer the same type of heart attack as Mr. Holtsclaw. But he has no way to distinguish what he claims is Mr. Holtsclaw's Testim-caused heart attack from a heart attack caused solely by the preexisting risk factors that Mr. Holtsclaw indisputably possessed. Dr. Ardehali's opinion is inadmissible because, like Dr. Setaro's specific causation opinion in the AbbVie bellwether case (*Cribbs*), it "'amounts to nothing more than the *ipse dixit* of the expert.'" *Id.* at *22 (citation omitted). Absent Dr. Ardehali's testimony, the Court should grant summary judgment for Defendants because causation is an essential element of each of Mr. Holtsclaw's claims. *See* Defendants' Motion for Summary Judgment on Mr. Holtsclaw's Claims on State Law Grounds at 6–8.

**Dr. Jihad Abbas** - Dr. Abbas opines that Testim can cause venous thromboembolism ("VTE"), including deep vein thrombosis ("DVT"), and did cause Plaintiff Isaac A. Owens's ███████ DVT, which occurred just after he resumed Testim use. The Court should exclude his causation opinion for three reasons. First, like Dr. Setaro's inadmissible opinion, Dr. Abbas's specific causation opinion depends solely on his general causation opinion and "[o]ne cannot . . . simply take [his] unsupported word that because [Testim] can cause [DVT], it was a specific cause of [Mr. Owens's] injury." CMO 46, at *22. Second, Dr. Abbas's opinion does not "'fit' the facts of [Mr. Owens's] case." *Id.* at *5 (citing *Daubert*, 509 U.S. at 591–92). Dr. Abbas did not review the deposition testimony of Mr. Owens or his prescriber and, hence, was unaware of critical facts. ██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████ Third, Dr. Abbas's causation opinion is unreliable because he did not address or even review the epidemiological studies that contradict his opinion before he submitted his Report. Absent Dr. Abbas's testimony, the Court should grant summary judgment for Auxilium because causation is an essential element of each of Mr. Owens's claims. *See* Defendants' Motion for Summary Judgment on Mr. Owens's Claims on State Law Grounds at 12–13.

**Dr. Ardel Cagata and Dr. Martin Ozor**- Mr. Owens has identified portions of the testimony of two fact witnesses regarding the cause of his ██████ DVT as expert testimony on which he intends to rely. Dr. Ardel Cagata treated and diagnosed Mr. Owens's ██████ DVT. He did not know Mr. Owens had used Testim until he was contacted for his deposition. His testimony regarding causation is not supported by any reliable explanation as to how he arrived at it or how it relates to the specific facts regarding Mr. Owens's Testim use. Dr. Ozor is Mr.

2

Owens's primary care physician. He did not prescribe Testim to Mr. Owens and did not even know that Mr. Owens had used Testim until his deposition. His testimony also is unsupported by any reliable explanation of how he arrived at it or how it relates to the specific facts of Mr. Owens's Testim use. Dr. Cagata's and Dr. Ozor's testimony regarding the cause of Mr. Owens's second DVT is inadmissible because it is supported by nothing more than their "'*ipse dixit*.'" CMO 46, at *5 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

**Dr. David J. Handelsman** - Dr. Handelsman offers opinions on "disease mongering" and marketing. This Court previously excluded his opinions on "disease mongering," and should do so again because he has done no further study or analysis to support those opinions. *See* CMO 48, at *18. The Court also should exclude Dr. Handelsman's marketing opinions because they would not help the jury understand technical or scientific evidence, and, additionally Plaintiffs and their prescribing doctors did not see any of the Auxilium marketing materials that Plaintiffs provided to Dr. Handelsman for review. *Hines v. Wyeth*, No. 2:04-CV-0690, 2011 WL 2680834, at *4 (S.D. W. Va. July 8, 2011) ("[T]estimony concerning defendants' marketing strategy is irrelevant to plaintiff's case and therefore inadmissible" where there is no "evidence suggesting that plaintiff or her prescribing physicians were influenced by defendants' promotional conduct").[1]

**Dr. Peggy Pence** - Dr. Pence offers opinions on regulatory matters and marketing. In doing so, she purports to divine Auxilium's intent based on her review of testimony of Auxilium employees and internal company documents, and she attempts to use the term "intended use" as a backdoor to present this inadmissible testimony to the jury. Dr. Pence's testimony on

---

[1] AbbVie recently moved for reconsideration of this Court's order denying its motion *in limine* to exclude evidence of advertising that did not influence plaintiffs' prescribing physicians. ECF No. 2117.

Auxilium's intent should be excluded because she "merely draws 'inferences from the evidence' that the jury could draw equally well." CMO 48, at *13 (citation omitted). In addition, Dr. Pence's opinions regarding marketing—like Dr. Handelsman's—should be excluded because Plaintiffs and their prescribing physicians did not rely on the marketing materials on which she opines.

**Dr. Steven Woloshin** - Dr. Woloshin offers opinions on marketing and "disease mongering." His opinions should be excluded for the same reasons that Dr. Handelsman's and Dr. Pence's opinions should be excluded.

## ARGUMENT

Federal Rule of Evidence 702 governs the admissibility of expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods.

Rule 702 requires federal courts to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. This Court "plays the role of gatekeeper in determining whether proposed expert testimony meets the standards of Rule 702." CMO 46, at *5. In that role, the Court must determine "(1) whether the witness is qualified, (2) whether the expert's applied methodology is scientifically reliable, and (3) whether the testimony will assist the trier of fact to understand the evidence or determine a fact in issue." *Id.* (citing *Myers v. Ill. Cent. R.R. Co.* 629 F.3d 639, 644 (7th Cir. 2010)).

4

Plaintiffs bear the burden to establish by a preponderance of the evidence that their experts' proposed testimony satisfies the requirements of Rule 702 and *Daubert*. CMO 46, at *6. Plaintiffs have failed to satisfy their burden with respect to the proposed expert testimony described below.

## I. THE COURT SHOULD EXCLUDE DR. ARDEHALI'S SPECIFIC CAUSATION OPINION THAT TESTIM CAUSED MR. HOLTSCLAW'S HEART ATTACK



Dr. Ardehali testified that if he treated a ███████ man just like Mr. Holtsclaw ██████ ███████████████████████████████ and no testosterone use, who presented with a heart attack, he "would tell this patient that he has multiple risk factors for coronary disease and those risk factors contributed to his heart attack." Ardehali Dep. ("Ex. 1") at 134:24–135:7. But if he treated the man's twin brother with the identical medical history except that he had been taking Testim for seven months prior to his heart attack (*i.e.*, Mr. Holtsclaw), he would diagnose the cause of the heart attack as Testim. *Id.* at 139:19–140:1. More generally, in Dr. Ardehali's opinion, "if there is a patient who has . . . the background of having higher risk of a heart attack, and they are put on Testim . . . and they have a heart attack within a few months and then you do a cath[eterization] and you find a clot, I would say Testim caused it," even though Dr. Ardehali conceded that a clot often is observed on catheterization of patients who experience heart attacks in the absence of testosterone use. *Id.* at 139:19–140:1, 153:7–18.

Dr. Ardehali's specific causation opinion regarding Mr. Holtsclaw fails Rule 702 and *Daubert* and should be excluded for the same reason Dr. Setaro's specific causation opinion was excluded by this Court in the *Cribbs v. AbbVie* bellwether case. To paraphrase this Court's opinion excluding Dr. Setaro's proposed testimony:

> Essentially, Dr. [Ardehali's] opinion boils down to a conclusion that because [Testim] is capable of causing heart attacks, he believes it contributed to [Mr. Holtsclaw's] heart attack, regardless of the other risk factors [Mr. Holtsclaw] had. One cannot, however, simply take Dr. [Ardehali's] unsupported word that

because [Testim] can cause heart attacks, it was a specific cause of [Mr. Holtsclaw's] injury. An opinion like this one that "amounts to nothing more than the *ipse dixit* of the expert" is not admissible.

CMO 46, at *22 (quoting *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.2d 827, 837 (7th Cir. 2015)).

### A. Mr. Holtsclaw Must Establish Through Expert Testimony that Testim Was a Substantial Factor in Causing His Heart Attack

To establish causation under Tennessee law, which governs his claims, Mr. Holtsclaw bears the burden to prove that Testim was a substantial factor in bringing about his heart attack. *Jackson v. Ford Motor Co.*, 842 F.3d 902, 908 (6th Cir. 2016). He must prove both general and specific causation, and he must do so through expert testimony. *See Nozinich v. Johnson & Johnson, Inc.*, No. 09-02015 DKV, 2011 WL 13124085, at *5 (W.D. Tenn. July 6, 2011).

To satisfy his burden, Mr. Holtsclaw offers two reports and the testimony of Dr. Ardehali, a medical doctor who is board-certified in cardiology and who also has a Ph.D. in molecular physiology and biophysics. Ardehali Dep. at 9:20–10:1. One report generally opines that Testim can cause MACE. *See* Report of Hossein Ardehali, M.D., Ph.D., FACC, FAHA, dated July 17, 2017 ("Ex. 2"). The second report opines that Testim did cause Mr. Holtsclaw's heart attack. *See* Letter from Hossein Ardehali, M.D., Ph.D. to Dr. Mark A. Hoffman, dated July 17, 2017 ("Ardehali Report") ("Ex. 3").

Regarding general causation, despite his own view that TRT medicines can cause major cardiovascular events ("MACE"), Dr. Ardehali concedes "that there is no scientific consensus on this issue in the scientific community, and there are different views" about the issue. Ardehali Dep. at 129:13–130:13. Because this Court already has upheld Dr. Ardehali's general causation opinion that TRT medicines can cause MACE against a *Daubert* challenge, Defendants will not repeat that challenge here. CMO 46, at *9–14. At trial, Defendants will show that there is no

6

reliable scientific evidence to establish that Testim causes MACE. For purposes of this motion, Defendants challenge Dr. Ardehali's specific causation opinion.

###### B. Dr. Ardehali's Specific Causation Opinion Should be Excluded Because He Fails to Offer a Reasonable Basis for Concluding that Mr. Holtsclaw's Pre-Existing Medical Conditions Were Not the Sole Cause of His Heart Attack

Dr. Ardehali proposes to testify that Testim use caused Mr. Holtsclaw's heart attack. He reaches that conclusion by purporting to apply a differential etiology. Although a differential etiology "is a reliable methodology for making a specific-causation determination, . . . 'an expert must do more than just state that she is applying a respected methodology, she must follow through with it.'" CMO 46, at *17 (quoting *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 773 (7th Cir. 2014)). An expert purporting to apply a differential etiology must "provide a reliable basis for concluding that the drug at issue was a 'substantial factor' in the development of the plaintiff's injury and that the other potential causes are unlikely to have been the injury's sole cause." *Id.* (citing *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 433 (7th Cir. 2013)); *see also Guinn v. AstraZeneca Pharm. LP*, 602 F.3d 1245, 1253 (11th Cir. 2010) ("[A]n expert must provide a reasonable explanation as to why he or she has concluded that [any alternative cause suggested by the defense] was not the sole cause of the plaintiff's injury" (citations and internal quotation marks omitted)).

Dr. Ardehali's specific causation opinion should be excluded because he has offered no reliable basis to conclude that Mr. Holtsclaw's pre-existing medical conditions, which are known risk factors for heart attacks, are unlikely to have been the sole cause of his heart attack. Indeed, Dr. Ardehali concedes that there is no way to distinguish the cause of Mr. Holtsclaw's heart attack from the cause of a heart attack in a man who was not using a TRT medicine, but who had the identical pre-existing risk factors as Mr. Holtsclaw.

7

 Ardehali Dep. at 142:2–8, 144:21–23, 147:11–23, 150:21–24; Ardehali Report at 3. ██████████████████ ██████████████████████████████ Ardehali Dep. at 61:15–63:18, 64:23–65:15.

Dr. Ardehali testified that if he treated a ██████ man like Mr. Holtsclaw ██ ██████████████████████████████ and no testosterone use, who presented with a heart attack, he "would tell this patient that he has multiple risk factors for coronary disease and those risk factors contributed to his heart attack." Ardehali Dep. at 134:24–135:7. But if he treated the man's twin brother with the identical medical history who had been taking Testim for seven months prior to his heart attack, *i.e.*, Mr. Holtsclaw, "I would say it was caused by Testim if a clot" is found. *Id.* at 135:14–136:24.

> Q.      But any time you find a ████████████████████
> █████████████████████ you can find a heart attack with [fresh]
> thrombus, correct?
>
> A.      You may find that, that's correct.
>
> Q.      And if you saw that patient walk into your hospital, you would not write it
> up as a case report in the medical literature and say, "Gee, this has never been
> seen before," would you?
>
> A.      I would not, no.
>
> Q.      Because you see that every day of the week, correct?
>
> A.      You see those cases.
>
> Q.      And now that same patient with those risk factors comes in except that he
> has used Testim for seven months and now you are going to say that the cause of
> the fresh thrombus and the heart attack is Testim, correct?

A.      That's correct.

*Id.* at 140:9–141:3.

Dr. Ardehali testified that he came to the conclusion that Mr. Holtsclaw's heart attack was caused by Testim—and not solely by his pre-existing risk factors—based on his knowledge that Mr. Holtsclaw had used Testim ███████████████████████████████████████ ███████████████████████████████████████████ *Id.* at 156:4-17. In Dr. Ardehali's opinion, "if there is a patient who has . . . the background of having higher risk of a heart attack, and they are put on Testim . . . and they have a heart attack within a few months and then you do a cath[eterization] and you find a clot, I would say Testim caused it." *Id.* at 139:19– 140:1. In other words, because, in his view, Testim can cause a heart attack in those circumstances, Testim is a cause of every such heart attack. That is an unscientific methodology that cannot be squared with *Daubert*.

Dr. Ardehali concedes that a patient who has not used a TRT medicine could have the same type of heart attack as Mr. Holtsclaw—████████████████████████████████ ███████████—and produce the same cardiac catheterization results:

> Q.      Men who never used testosterone therapy with—who have underlying cardiovascular disease, they have ████████ heart attacks caused by blood clots, do they not?
>
> A.      They may, yes.
>
> Q.      And when you do the cardiac catheterization, on the film you would see evidence of fresh thrombus, correct?
>
> A.      You may.
>
> Q.      Even though they've never used any testosterone replacement therapy, correct?
>
> A.      It's possible, that's correct.

*Id.* at 153:7–18; *see also id.* at 156:19–157:2 ("Q. And patients present every day who have never used testosterone who have a fresh clot that's observed on their cardiac catheterization, isn't that true? . . . A. There are certain patients who may.").

This Court excluded Dr. Setaro's specific causation opinion because, as with Dr. Ardehali, he did "not point to anything about [the plaintiff's] case in particular to suggest that his injury was the result of AndroGel rather than the multiple other risk factors that Dr. Setaro was unable to rule out." CMO 46, at *22. Other courts consistently have excluded expert opinions on causation where, as here, the expert has no reliable basis to exclude other potential causes as the sole cause of the plaintiff's injury.

For example, in *Guinn*, the court affirmed exclusion of proposed expert testimony that use of a medicine along with pre-existing risk factors caused plaintiff's diabetes because "[a]n expert . . . cannot merely conclude that all risk factors for a disease are substantial contributing factors in its development. 'The fact that exposure to [a substance] may be a risk factor for [a disease] does not make it an actual cause simply because [the disease] developed.'" *Guinn v. AstraZeneca Pharm. LP*, 602 F.3d 1245, 1255 (11th Cir. 2010) (citation omitted).

Similarly, in *Kelley v. Am. Heyer-Schulte Corp.*, 957 F. Supp. 873 (W.D. Tex. 1997), the court excluded an expert's opinion that the plaintiff's Sjogren's Syndrome was caused by silicone breast implants where the expert "admit[ted] that if the Plaintiff did *not* have breast implants but had the exact same symptoms and blood chemistry, then his diagnosis would have been non-implant-caused Sjogren's Syndrome." *Id.* at 882 (emphasis in original). As the court explained, "[e]ssentially, this is a bit like saying that if a person has a scratchy throat, runny

nose, and a nasty cough, that person has a cold; if, on the other hand, that person has a scratchy

throat, runny nose, nasty cough, and wears a watch, they have a watch-induced cold." *Id.*[2]

 Here, Dr. Ardehali fails to offer a reliable explanation as to why Testim caused Mr.

Holtsclaw's ▮▮▮▮ heart attack. Moreover, he concedes that Mr. Holtsclaw's many risk factors

for MACE could have been the sole cause of the same ▮▮▮▮ heart attack with fresh thrombus

in another man with an identical medical history who did not use Testim or any other TRT

medicine. Accordingly, the Court should exclude his specific causation opinion.

## II. THE COURT SHOULD EXCLUDE DR. ABBAS'S CAUSATION OPINION THAT TESTIM CAN AND DID CAUSE MR. OWENS'S DVT

 Under Kentucky law, which governs Mr. Owens's claims, Mr. Owens bears the burden of

proving that Testim was a substantial factor in causing his injury. *See Pathways, Inc. v.

Hammon*, 113 S.W.3d 85, 92 (Ky. 2003). Plaintiffs must prove both general and specific

causation, which "require scientific assessments that must be established through expert

testimony." *Adams v. Cooper Indus., Inc.*, Civil Action No. 03-476-JBC, 2012 WL 2339741, at

*1 (E.D. Ky. June 19, 2012).

 Plaintiff has offered Dr. Abbas, who is a vascular surgeon, for that purpose. Abbas Dep.

("Ex. 4") at 13:15–16. Dr. Abbas proposes to testify that Testim can and did cause Mr. Owens's

▮▮▮▮ DVT in July 2013. Report of Jihad Abbas M.D., FACS ("Abbas Report") ("Ex. 5") at

---

[2] *Accord Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 667, 671 (6th Cir. 2010) (reversing judgment for a plaintiff who alleged that his Parkinson's disease was caused by exposure to manganese in welding rods where testimony of plaintiff's causation expert had been improperly admitted because "[w]hen asked how to 'tell the difference between a welder with idiopathic Parkinson's disease and a welder . . . tipped into the Parkinson's disease by welding,' he answered with tests he *might* do, not tests he had done" (emphasis in original)); *Johnson v. Memphis Light, Gas & Water Div.*, No. 2:12-cv-02664-STA-tmp, 2016 WL 1249614, at *5 (W.D. Tenn. Mar. 28, 2016) (excluding expert opinion that death was caused by heat stroke "based on the environmental conditions in which his body was found" because the expert "agreed that people can die in hot environments from causes other than heat and testified that his findings also would be consistent with sudden cardiac death").

10. As explained below, the Court should exclude Dr. Abbas's proposed testimony on causation. Dr. Abbas's causation opinion should be excluded for three independent reasons. First, he fails to offer a basis for specific causation independent of his general causation opinion that Testim can cause DVT. Second, his specific causation opinion does not account for critical facts regarding Mr. Owens's Testim use, l█████████████████████████████████████████ ████████████████████████████████████████ Moreover, Dr. Abbas has failed to identify any scientific support or any methodology to determine how these critical biological differences are supported by his general causation opinion. Third, Dr. Abbas's causation opinion should be excluded because he cherry-picked studies to support his preconceived conclusion.

### A. Dr. Abbas Fails to Offer Any Reliable Specific Causation Theory Independent of his General Causation Theory

Dr. Abbas's opinion is characterized by the same flaw that caused this Court to exclude Dr. Setaro's opinion in the *Cribbs v. AbbVie* bellwether case. Like Dr. Setaro's excluded opinions, Dr. Abbas does not "provide an adequate explanation for his conclusion that [Testim], and not some other combination of causes, led to the plaintiff's injury." CMO 46, at *22. Instead, like Dr. Setaro, Dr. Abbas's opinion:

> boils down to a conclusion that because [Testim] is capable of causing [VTE], he believes it contributed to [plaintiff's DVT], regardless of the other risk factors [Mr. Owens] had. One cannot, however, simply take Dr. [Abbas's] unsupported word that because [Testim] can cause [VTE], it was a specific cause of [Mr. Owens's] injury.

CMO 46, at *22.

Dr. Abbas concedes that men who do not use testosterone can experience the same type of DVT that Mr. Owens experienced. Abbas Dep. at 187:21–188:9. Dr. Abbas further concedes that prior to the time that Mr. Owens used Testim, ███████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████ *Id.* at 189:13–191:8,

195:2–7, 197:18–198:4, 202:4–203:5.  Although Dr. Abbas cannot quantify the contribution of

each of his risk factors in causing Mr. Owens's DVT, Dr. Abbas testified that Testim "tipped

[Mr. Owens] over the edge." *Id.* at 195:8–14, 197:9–17.

 Dr. Abbas has no reliable basis to conclude that Mr. Owens's preexisting high risk factors

were unlikely to be the sole cause of his DVT.  ███████████████████████████

█████████████████████████████████████████████████████████████

███████████████████████████████████ *Id.* at 195:8–14.

 The fact that Mr. Owens was diagnosed with DVT days after he claims to have resumed

Testim use is not a reliable basis to establish Testim as the cause of his DVT.  It is well-settled

that "[t]he mere existence of a temporal relationship between taking a medication and the onset

of symptoms does not show a sufficient causal relationship." *Ervin v. Johnson & Johnson, Inc.*,

492 F.3d 901, 904–05 (7th Cir. 2007); *accord McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233,

1243 (11th Cir. 2005) ("[S]imply because a person takes drugs and then suffers an injury does

not show causation.  Drawing such a conclusion from temporal relationships leads to the blunder

of the *post hoc ergo procter hoc* fallacy." (emphasis in original)); *Black v. Food Lion, Inc.*, 171

F.3d 308, 313 (5th Cir. 1999) (using temporal proximity to establish causation "is not an exercise

in scientific logic but in the fallacy of *post-hoc procter-hoc* reasoning, which is as unacceptable

in science as in law" (emphasis in original)).

████████████████████████████████████████████████████████████

███████████████████████████████████████████████ That "observation is largely temporal

proximity in disguise," which "posits that arguably the last additive factor . . . is necessarily the

         13

one that caused or substantially contributed to causing the disease." *Haller v. AstraZeneca Pharm. LP*, 598 F. Supp. 2d 1271, 1297–98 (M.D. Fla. 2009). But "it is equally plausible that the additive effects of, or an incremental increase in, one or more of the other risk factors was the actual tipping point." *Id.* at 1298.



▇▇▇▇▇▇▇▇▇▇▇▇▇ Abbas Dep. at 178:11–23; *see* I. Owens Dep. ("Ex. 6") at 203:7–9; Ex. 7 at 374 ▇▇▇▇▇▇▇▇▇▇, 383 ▇▇▇▇▇▇▇▇▇▇, 386 ▇▇▇▇▇▇▇, 387 ▇▇▇▇▇▇▇▇. ▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇, Dr. Abbas testified that it did not change his opinion:

▇▇▇▇▇▇▇▇▇▇▇

▇▇ ▇▇

▇▇▇▇▇▇▇ Does that impact your decision at all?

A.   It does not impact my impression that the Testim caused him his DVT.

Q.   So you're just saying if he's exposed to Testim, your opinion is going to be Testim caused his DVT?

A.   Exactly.

Abbas Dep. at 179:11–22.

Dr. Abbas had no reasonable basis to conclude that it was Mr. Owens's Testim use, rather than his pre-existing risk factors, that caused his ▇▇▇ DVT. Dr. Abbas's frequent references to biological mechanisms by which he says that testosterone can result in blood clots "relate to *general* causation and carry little if any relevance to the question of whether [Testim] caused

[DVT] in [Mr. Owens's] *specific* case." *Haller*, 598 F. Supp. 2d at 1298 (emphasis in original).

Accordingly, his specific causation opinion should be excluded.

### B. Dr. Abbas's Specific Causation Opinion Does Not Account for Critical Facts Relating to Mr. Owens's Testim Use

Dr. Abbas has never met or spoken with Mr. Owens, his wife, or Mr. Owens's treating physicians. Nor has he ever examined or treated Mr. Owens. Abbas Dep. at 27:22–28:11. He did not review the deposition testimony of Mr. Owens, his wife, or Mr. Owens's prescribing and primary care physicians. *Id.* at 40:4–41:2. As a result, Dr. Abbas was unaware of critical facts bearing on Mr. Owens's Testim use, which render his opinion regarding the cause of Mr. Owens's DVT unreliable and irrelevant because they do not "'fit' the facts of [Mr. Owens's] case." CMO 46, at *5 (citing *Daubert*, 509 U.S. at 591–92).



I. Owens Dep. at 191:21–192:14, 200:2–16; *see also* Abbas Report at 3

. Indeed, Dr. Abbas was not even aware of the labeling instructions for Testim application: "I am not very sure. I don't remember, but I think you can apply it anywhere on your body. I think it's the underarms or something like this." Abbas Dep. at 155:11–15.

*Id.* at 156:17–23.

Ex. 8 at 2606–07; Abbas Dep. at 157:16–158:15. Although he had not

reviewed that study, Dr. Abbas testified that "I have to agree that there are parts of the body that absorb better medications than other parts, and the medication goes into the blood stream." *Id.* at 159:23–160:1. 

*Id.* at 160:4–18.



*Id.* at 165:9–24.

I. Owens Dep. at 192:18–21, 198:17–24, 199:19–22, 203:10–16; Abbas Dep. at 166:11–168:11.[3] And he conceded that he does not know what dose of Testim is necessary to increase DVT risk.

---

[3] 

I. Owens Dep. at 286:7–13.

*Id.* at 289:9–20. Mr. Owens has the burden

Q.      Have you done anything to determine what does of Testim is required to cause a DVT?

A.      No.

Q.      Do you have an opinion on what dose of Testim a person needs to increase the risk of DVT?

A.      No.

Abbas Dep. at 161:15–20.

Despite the fact that he does not know what dose of Testim is necessary to pose an increased risk of DVT ███████████████████████████████████████ ██████████████████████████████████████, Dr. Abbas nevertheless testified that Testim caused Mr. Owens's DVT because Testim "tipped the balance against Mr. Owens's disease" ██████████████████████████████████████████████ ██████████████████████████████████████████████████████ *Id.* at 169:13–171:21.  But without any basis to opine on the dose-response relationship supposedly necessary to cause DVT, Dr. Abbas's opinion is not admissible under Rule 702 and *Daubert*. *See McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1242–43 (11th Cir. 2005) (excluding expert testimony that "offers no opinion about the dose of Metabolife that caused ischemic strokes in three Plaintiffs and a heart attack in the other," but instead opined that "any amount of Metabolife is too much, which clearly contradicts the principles of reliable methodology").

Dr. Abbas also was unable to reliably exclude the possibility that Mr. Owens's DVT arose prior to his resumed Testim use.  He concedes that, "[i]t's variable," but it may be "about a

to prove the elements of his claims by a preponderance of the evidence.  His speculation about what his prescribing doctor might have said and what he might have done in response is insufficient to meet that burden.  ████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████      D. Smith Dep. ("Ex. 9") at 39:18–20, 40:3–6.

day or two" before a patient with a DVT experiences symptoms, and that, in some cases, DVTs

are asymptomatic.  Abbas Dep. at 72:16–19, 74:18–20.  When asked how he knew that Mr.

Owens's DVT was not asymptomatic before he started using Testim on July 9, 2013, Dr. Abbas

responded "You can't know.  You can't tell."  *Id.* at 216:10–217:5. 

*Id.* at 217:6–15, 218:8–11, 219:14–18.

*Id.* at
219:14–18.

*Id.* at 218:15–220:1.

Finally, Dr. Abbas has not identified any plausible mechanism by which Testim

supposedly causes DVT that fits the facts of Mr. Owens's case.  Based on his review of the

literature, Dr. Abbas identifies three biological mechanisms by which he claims TRT can cause

DVT.  He claims that testosterone use can increase the levels of hematocrit, estradiol, and

thromboxane A2 in the blood, which in turn can cause blood clots, including DVT.

Abbas Report at 8–10; Abbas Dep. at 133:20–134:12

, 135:15–136:12

, 138:15–21(same), 142:8–13

.

18

**C.      Dr. Abbas's Specific Causation Testimony Should be Excluded Because He Cherry-Picked Evidence to Support a Preconceived Conclusion**

Dr. Abbas did not address or even review all the evidence that bears on the question of whether Testim caused Mr. Owens's DVT before forming his opinion.  In particular—and unlike the experts in the AbbVie bellwether cases whose opinions this Court held satisfied Rule 702 and *Daubert*, CMO 46, at *15–16—Dr. Abbas's Report does not even address the epidemiological studies that contradict his opinion, most of which he had not even reviewed prior to submitting his Report.  His causation opinion should be excluded for that additional reason.

Dr. Abbas has not done any scientific studies, published any scientific articles, given any scientific talks about, or otherwise had any professional involvement with Testim or any other TRT medicine apart from his work on Mr. Owens's case.  Abbas Dep. at 20:21–21:9, 24:16–25:8.  He has never prescribed Testim or any other TRT medicine.  *Id.* at 21:13–15, 25:9–11.  He has neither treated a patient who developed VTE while on Testim or any other TRT medicine nor diagnosed a patient with VTE caused by Testim or any other TRT medicine.  *Id.* at 23:5–8, 23:13–17, 25:12–19, 25:24–26:4.  He also never has advised a patient to discontinue use of Testim or any other TRT medicine.  *Id.* at 23:9–12, 25:20–23.  Prior to Mr. Owens's case, he had never examined whether TRT medicines increase VTE risk.  *Id.* at 52:23–53:3.

According to Dr. Abbas, he was retained after one of Mr. Owens's lawyers who also is a doctor and former colleague of Dr. Abbas, asked for his "general opinion about a random patient with a DVT. . . .  As a first look, I studied, I looked, and I told him that it might be that the new medication that he started a few days ago is probably a reason why he suddenly developed a DVT."  *Id.* at 50:10–51:1, 51:7–14.[4]  Thereafter, Dr. Abbas claims to have conducted a Google

---

[4] Dr. Abbas spent a total of 15 hours on Mr. Owens's case before his deposition, including his literature search, developing his opinions, producing his report, discussing the case with

search for literature limited to terms such as "[t]estosterone effect on blood, blood products, testosterone effect on platelets, on other products of the blood, the metabolism of testosterone, [and] the absorption of testosterone into the blood . . . ." *Id.* at 32:14–20.  Significantly, Dr. Abbas does not claim to have searched for literature regarding the effect of testosterone on VTE or DVT.  Dr. Abbas's methodology in forming his opinions consisted solely of his literature search and his "knowledge as a vascular surgeon." *Id.* at 30:8–14.

Dr. Abbas concedes that he did not undertake "a systematic review" of "all the reports that were relevant to VTE risk," but instead undertook a "sampling" to "see is there anything that . . . disprove[d] [his] point." *Id.* at 147:20–148:5.  He further concedes that there is no reliable epidemiological peer-reviewed science that supports his opinion, but there are epidemiological studies that contradict his opinion that TRT medicines cause DVT:

> Q.    Okay.  Let me ask the question so we're on the same page.  Then you have not seen in the literature search any large epidemiological study that shows that testosterone replacement therapy causes or increases the risk of VTE in hypogonadal men, correct?
>
> [Objection]
>
> A.    I have not—yeah.  I have not seen—in my literature search, I have not seen.
>
> Q.    And, in fact, you have seen in your literature search large observational studies that have gone the opposite direction and have concluded that there is no increased risk of VTE as a result of TRT use in hypogonadal men, correct?
>
> A.    Correct.  But they do not apply to high-risk patients.  The same like hormone replacement therapy in female is fine in a normal female, but in female with high risk, for example, Factor V Leiden deficiency, it's not recommended.

Abbas Dep. at 123:23–124:16; *see also id.* at 120:5–7 ("[T]here is no huge studies that shows in general testosterone replacement therapy causes DVT.").

---

Mr. Owens's attorney, and reviewing additional literature and Defendants' expert reports after his Report was submitted.  Abbas Dep. at 48:14–49:15.

As this Court has noted, there are "four epidemiological studies addressing TRT and VTEs." CMO 46, at *15.[5] Three of them—"the Sharma, Li, and Baillargeon studies—found no statistically significant association" between TRT medicines and VTE. *Id.* Only one of them—the Martinez study—"found a statistically significant association between VTE and any subgroup of VTE users." *Id.* But Dr. Abbas did not discuss the Sharma, Li, or Baillargeon studies in his Report.

> Q. But you did not discuss or include in your report the epidemiological large observational studies that were assessing VTE risk as a result of testosterone replacement therapy, right?
>
> [Objection]
>
> A. I did not. I don't believe I did.

Abbas Dep. at 116:21–117:2; *see also id.* at 33:15–24 ("Q. So you conducted research and you found information in articles that supported your opinions, and those are the articles that you used to generate your report, correct? A. Yes.").

In his Report, Dr. Abbas lists as a reference source, but does not address, the Baillargeon study. He did not even review the Sharma study until *after* he submitted his Report and had formed his opinions, and did not review the Li study until he was confronted with it at his deposition. *Id.* at 40:12–18; 149:3–11, 149:19–22, 150:11–19, 152:4–9. At his deposition, he testified that he did not address the Baillargeon study in his Report "because it does not prove

---

[5] The four studies are: Jacques Baillargeon et al., *Risk of Venous Thromboembolism in Men Receiving Testosterone Therapy*, 90 Mayo Clinic Proc. 1038 (2015) ("Ex. 10"); Rishi Sharma et al., *Association Between Testosterone Replacement Therapy and the Incidence of DVT and Pulmonary Embolism: A Retrospective Cohort Study of the Veterans Administration Database*, 150 Chest J. 563 (2016) ("Ex. 11"); Hu Li et al., *Association Between Use of Exogenous Testosterone Therapy and Risk of Venous Thrombotic Events Among Exogenous Testosterone Treated and Untreated Men with Hypogonadism*, 195 J. Urology 1065 (2016) ("Ex. 12"); Carlos Martinez et al., *Testosterone Treatment and Risk of Venous Thromboembolism: Population Based Case-Control Study*, 355 BMJ i5968 (2016) ("Ex. 13"). *See* CMO 46, at *3.

my opinion," and more generally dismissed the studies that contradict his opinion because they purportedly did not examine the effect of TRT medicines on men ███████████████ like Mr. Owens. *Id.* at 109:14–110:2, 145:6–8 207:9–22.[6]

Dr. Abbas, however, cites the Martinez study in his Report even though that study found no statistically significant increased VTE risk for the subgroup of testosterone users ███████ ██████████████ like Mr. Owens. Abbas Report at 9.

Q.    Okay. What Martinez found was in the subgroup of short-term users without pathologic hypogonadism, there was a statistically significant increased risk, correct?

A.    Right.

Q.    Then, if you turn to page—the next page, which is Table 3, you'll see that this is further stratification. So in Martinez there was no statistically increased risk among subgroup members ██████████████████ Do you see that?

A.    I stress again, statistically, yes.

. . .

Q.    ████████████████████████████████████

A.    Yes, definitely.

Q.    So he would fall—he would not fall into a statistically significant Martinez subgroup, correct?

[Objection]

---

[6] Initially, when confronted with the Li study, which found no significant association between TRT and VTE in hypogonadal men, Dr. Abbas testified that he discounted the study because ████████████████████████████████████████████████████████ Abbas Dep. at 150:17–21. ████████████████████████████████████████████ ████████████████ *Id.* at 150:22–151:10. He then testified that "I cannot dismiss my conclusion just relying on this study" because the data drawn from a large commercial insurance database and the claims data was collected for the purpose of payment, not research, and the authors could not confirm that the medicine had been taken as prescribed or that the patients actually had hypogonadism. *Id.* at 151:11–152:19.

A.     He would not fall in the statistically significant, yes.

Abbas Dep. at 215:1–11, 215:17–24.

Thus, Dr. Abbas's post-hoc basis for rejecting the epidemiological studies that contradict his opinion applies equally to the study he cites in support of his opinion. Dr. Abbas's failure to "provide a detailed, scientific critique which explains [his] disagreement" with the epidemiological studies that do not support his opinion compels that the Court exclude it. *See In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 26 F. Supp. 3d 449, 459–60 (E.D. Pa. 2014).[7]

## III.    THE COURT SHOULD EXCLUDE THE CAUSATION TESTIMONY OFFERED BY DR. ARDEL CAGATA AND DR. MARTIN OZOR

Mr. Owens has identified testimony provided by Dr. Cagata and Dr. Ozor regarding the alleged cause of his second DVT as expert opinion on which Mr. Owens intends to rely. *See* Plaintiffs' Disclosure of Expert Testimony Pursuant to Rule 26(a)(2)(C), dated July 19, 2017 ("Ex. 14"). That testimony is inadmissible because neither fact witness offered a reliable basis for it and neither was familiar with the facts regarding Mr. Owens's Testim use.

---

[7] *Accord In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig.*, 174 F. Supp. 3d 911, 930 (D.S.C. 2016) (excluding expert opinion where "Plaintiffs have made no showing whatsoever that [the expert] performed any search to obtain relevant literature, rather than cherry-picking studies that supported his conclusion"); *Tyree v. Bos. Sci. Corp.*, 54 F. Supp. 3d 501, 520–21 (S.D. W. Va. 2014) (excluding testimony where expert rejected peer reviewed literature contrary to his opinion "without a scientific basis for doing so"); *In re Bextra & Celebrex Mktg. Sales Practices & Prods. Liab. Litig.*, 524 F. Supp. 2d 1166, 1176 (N.D. Cal. 2007) (excluding expert testimony where expert "reache[d] his opinion by first identifying his conclusion . . . and then cherry-picking observational studies that support his conclusion and rejecting or ignoring the great weight of the evidence that contradicts his conclusion"); *In re Rezulin Prods. Liab. Litig.*, 369 F. Supp. 2d 398, 425–26 (S.D.N.Y. 2005) (excluding expert testimony "where the expert selectively chose his support from the scientific landscape" (citation and internal quotation marks omitted)).

### A.    Dr. Cagata's Causation Testimony is Inadmissible

Dr. Cagata treated and diagnosed Mr. Owens's █████ DVT.  At that time, he did not know that Mr. Owens had used Testim.  Cagata Dep. ("Ex. 15") at 78:17–79:1.  Dr. Cagata's only basis for testifying that Testim could cause DVT was his "general knowledge" from medical school in 1993 that "any of these hormones could" potentially cause DVT.  *Id.* at 65:4–66:2.  And his testimony that Testim could have caused Mr. Owens's █████ DVT is based solely on his view that "[m]ultiple risk factors can increase your risk of something" even though he concedes that any one of Mr. Owens's risk factors independently can cause DVT and that he cannot determine which risk factors are the cause of DVTs in any particular patient.  *Id.* at 66:18–68:16.

"[M]ost treating physicians have more training in and experience with diagnosis than etiology."  *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 673 (6th Cir. 2010).  For that reason, "courts must apply the *Daubert* principles carefully in considering" a treating physician's testimony regarding etiology because "'[t]he ability to diagnose medical conditions is not remotely the same . . . as the ability to deduce . . . in a scientifically reliable manner, the causes of those medical conditions.'"  *Id.*  (citation omitted).  Dr. Cagata's testimony regarding the cause of Mr. Owens's █████ DVT is inadmissible under Rule 702 and *Daubert* because he fails to state any methodology for reaching that conclusion, much less a reliable one.  Nor does he address any of the specific facts relating to Mr. Owens's Testim use.  Dr. Cagata's testimony regarding the cause of Mr. Owens's █████ DVT amounts to nothing more than his "'*ipse dixit*,'" which plainly fails to satisfy Rule 702 and *Daubert*.  CMO 46, at *5 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

### B. Dr. Ozor's Causation Testimony is Inadmissible

Dr. Ozor's testimony regarding causation is inadmissible for the same reason. Dr. Ozor is Mr. Owens's primary care physician. Dr. Ozor did not prescribe Testim to Mr. Owens or even know that Mr. Owens was using Testim until Dr. Ozor gave his deposition testimony. Ozor Dep. ("Ex. 16") at 53:22–54:12. He does not prescribe Testim or any other TRT medicine to any of his patients. *Id.* at 83:7–15, 84:5–7. Dr. Ozor conceded that he is not familiar with particular risks associated with TRT medicines. *Id.* at 83:22–84:1.

Dr. Ozor testified that he has general knowledge that "hormone replacement therapy . . . can cause blood clot[s]," but "[n]ot particular about testosterone." *Id.* at 87:13-20. He conceded that "I don't know much about [Testim], really." *Id.* According to Dr. Ozor, Mr. Owens had many risk factors for DVT, ██████████████████████████

██████████ *Id.* at 80:16–81:16. He further testified that the cause of Mr. Owens's DVT "can be multifactorial. . . . And as far as I know, I don't know about [Testim]," but "it's low on my list." *Id.* at 78:3–17. Moreover, Dr. Ozor was unaware of any specific facts relating to Mr. Owens's Testim use. *Id.* at 115:18–116:14. Like Dr. Cagata, Dr. Ozor did not provide any scientifically reliable basis for his testimony regarding causation. That testimony should be excluded under Rule 702 and *Daubert*.

## IV. THE COURT SHOULD EXCLUDE DR. DAVID J. HANDELSMAN'S OPINIONS CONCERNING DISEASE MONGERING AND MARKETING

Dr. David J. Handelsman "is a medical doctor and medical school professor who specializes in reproductive endocrinology and andrology." CMO 48, at *18. He lives, practices, and teaches in Australia. *Id.* Among other things, Dr. Handelsman proposes to testify that pharmaceutical companies, "including Auxilium, engaged in 'disease mongering' or 'the selling of sickness that widens the boundaries of illness and grows the markets for those who sell and

deliver treatments.'" Report of David J. Handelsman, MB BS, FRACP, Ph.D., FAHMS, dated

July 1, 2017 ("Handelsman Report") ("Ex. 17") at 3, ¶¶ 17, 19–21. In addition, Dr. Handelsman

offers numerous opinions regarding Auxilium's "marketing" and "promotion" of Testim, and

more generally that of the "pharmaceutical industry" relating to TRT medicines *Id.* at 3–5, ¶¶

15, 16, 25, 27, 31, 33. The Court should exclude those opinions.

### A. The Court Should Exclude Dr. Handelsman's Opinions Concerning Disease Mongering

In the AbbVie bellwether cases, this Court excluded Dr. Handelsman's opinions

regarding "disease mongering" because "he has no background and appears not to have done any

study or writing in this area." CMO 48, at *18. Dr. Handelsman offers the same "disease

mongering" opinions in these cases that he offered in the AbbVie bellwether cases. Handelsman

Report at 3, ¶¶ 17, 19–21, 45–52. Since his deposition in the AbbVie bellwether cases, Dr.

Handelsman has not conducted any additional analysis concerning "disease mongering."

Handelsman Dep. ("Ex. 18") at 41:6–18. The Court should exclude Dr. Handelsman's "disease

mongering" opinions in these cases for the same reasons the Court excluded them in the AbbVie

bellwether cases.

### B. The Court Should Exclude Dr. Handelsman's Marketing Opinions

Dr. Handelsman testified that he "wouldn't hold [him]self out as an expert" in

pharmaceutical marketing. Instead he would describe himself as an experienced "observer" of

pharmaceutical marketing. Handelsman Dep. at 31:13–17. But he has not observed Auxilium's

marketing of Testim. Dr. Handelsman has never prescribed Testim, which is not even available

in Australia. *Id.* at 27:22–28:4. No sales representative has ever detailed Testim to him. *Id.* at

279:4–6. He has never seen a television advertisement for Testim. *Id.* at 215:1–10. And he has

never conducted any studies involving Testim advertisements. *Id.* at 37:12–16.

He nevertheless intends to offer opinions on certain Auxilium marketing materials that were selected and provided to him by Plaintiffs' counsel. *Id.* at 278:4–7; Handelsman Report at 67–68. Dr. Handelsman does not know whether Auxilium submitted those marketing materials to FDA for approval or whether they were FDA-approved. Handelsman Dep. at 33:25–34:2. And he concedes that his criticisms do not take into account FDA approval because "I'm not an expert on what the FDA allows for marketing claims and so on." *Id.* at 283:20–21, *see id.* at 284:23–25 ("Look, I'm not an expert in what FDA allows and doesn't allow in the way of marketing claims for efficacy and safety.").

## 1. Dr. Handelsman's Marketing Opinions Would Not Assist the Trier of Fact

Based on his review of marketing materials provided to him by counsel, Dr. Handelsman claims that references to "Low T" or "low testosterone" in Testim marketing conveyed "the unproven and unsound suggestion that testosterone treatment should be used off-label" to treat "numerous common medical disorders such as opioid use, obesity, diabetes, HIV/AIDS, hypertension, erectile dysfunction, and ageing." Handelsman Report at 67. He concludes that "[t]hese [Auxilium marketing] materials represent the epitome of disease mongering." *Id.* at 68. The Court should exclude his marketing opinions because they are offered to support his inadmissible "disease mongering" opinions. The Court also should exclude them because they will not help the jury understand scientific or technical evidence.

Dr. Handelsman admits that he has not seen any evidence that Auxilium explicitly marketed Testim to treat the comorbid conditions he identifies. Handelsman Dep. at 187:14–20, 192:5–21. He nevertheless contends that Auxilium did so based on his view that low testosterone is caused by those comorbid conditions and, therefore, any marketing referring to "low testosterone"—as opposed to "classical" or "pathological" hypogonadism—"implicitly"

invites treatment for those comorbidities. *Id.* at 187:14–20, 190:1–12 ("Low testosterone in

those situations . . . are due to comorbidities, so it's completely naive to say it's marketed for low

testosterone and nothing else when, in fact, it's all due to the comorbidities.").

Dr. Handelsman's marketing opinions stem from his belief that Testim was indicated

only for what he refers to as "classical" or "pathological" hypogonadism even though he

concedes that those words have never appeared in the Indications and Usage section of the

Testim label. *Id.* at 143:3–6, 146:3–6. Defendants dispute Dr. Handelsman's restrictive view of

the appropriate indications for Testim.[8]

If these cases survive summary judgment, a jury will resolve that issue based on the

evidence. Once it does, the jurors can resolve any allegations regarding Auxilium's marketing

materials and the inferences to be drawn from them without the help of Dr. Handelsman. The

jurors will not need Dr. Handelsman to tell them that "[i]n no instance of the materials reviewed

was there any mention of the sole unequivocal indication for testosterone replacement therapy—

for pathological disorders of the reproductive system such as primary (hypergonadotropic,

testicular) or secondary (hypogonadotropic, hypothalamo-pituitary) hypogonadism . . . ."

Handelsman Report at 68. Observations like that are apparent from the face of the materials and

constitute attorney argument masquerading as expert evidence, which is not admissible under

Rule 702 and *Daubert*. *See, e.g.*, *In re Air Crash Disaster at New Orleans, La.*, 795 F.2d 1230,

---

[8] *See, e.g.*, Expert Report of Nelson E. Bennett, Jr., M.D. (*Holtsclaw*) ("Ex. 19"), dated August 11, 2017 at 36 ("Many urologists . . . who treat men with hypogonadism, refer to . . . the AUA position statement," which provides that "Hypogonadism is defined as biochemically low testosterone levels in the setting of a cluster of symptoms, which may include reduced sexual desire (libido) and activity, decreased spontaneous erections, decreased energy and depressed mood," and the "Endocrine Society guidelines [which] state, 'We recommend that symptomatic men who have unequivocally low total and/or free testosterone levels that are assayed on at least 2 samples drawn before 10 am should be considered for TRT'").

1233 (5th Cir. 1986) ("[T]he trial judge ought to insist that a proffered expert bring to the jury more than the lawyers can offer in argument").

Dr. Handelsman also proposes to testify about the supposed influence of Auxilium's marketing on patients, physicians, and Testim sales. Handelsman Report at 3–4, ¶¶ 19, 25–29. In CMO 48, the Court stated that Dr. Handelsman's opinions on "the cause-and-effect relationship between AbbVie's marketing campaigns for AndroGel and overprescribing" were "outside his area of expertise," although plaintiffs apparently did not intend to offer those opinions through Dr. Handelsman. CMO 48, at *18. Dr. Handelsman concedes that his opinions about the supposed influence of Auxilium's marketing for Testim are not based on studies, focus groups, or any other methodological research. Handelsman Dep. at 41:23–42:7, 214:22–25, 246:22–247:10, 247:17–19. Those opinions should be excluded as outside his area of expertise.

Dr. Handelsman explained that such analysis was not necessary to support his opinions concerning the influence of marketing on physicians because "it is so obvious that . . . your eyes tell you the facts." Handelsman Dep. at 214:10–21. His opinions also should be excluded because they relate to matters within the common understanding of jurors. *See* CMO 48, at *13 (expert testimony inadmissible where it is "'. . . unhelpful to the trier of fact' because the expert merely draws 'inferences from the evidence' that the jury could draw equally well" (citation omitted)).

### 2. Dr. Handelsman's Marketing Opinions Do Not Fit the Facts of the Case

#### a. *There is No Evidence that Plaintiffs or Their Prescribing Doctors Relied on any of the Marketing Materials that Dr. Handelsman Reviewed*

There is no connection between the marketing materials that Dr. Handelsman reviewed and the facts of these cases because there is no evidence that Plaintiffs or their prescribing

physicians saw or relied on those materials. Dr. Handelsman's marketing opinions should be excluded for that independent reason.

Reliance is an essential element of Plaintiffs' claims for fraud and negligent misrepresentation. *See Prather v. Abbot Labs.*, 960 F. Supp. 2d 700, 715 (W.D. Ky. 2013) (Kentucky law); *Carter v. Danek Med., Inc.*, No. CIV. 96-3243-G, 1999 WL 33537317, at *5 (W.D. Tenn. June 3, 1999) (Tennessee law). Marketing materials on which Plaintiffs and their prescribing physicians did not rely cannot support their claims and are not relevant. *See*, *e.g.*, *Hines v. Wyeth*, No. 2:04-0690, 2011 WL 2680834, at *4 (S.D. W. Va. July 8, 2011) ("[T]estimony concerning defendants' marketing strategy is irrelevant to plaintiff's case and therefore inadmissible" where there is no "evidence suggesting that plaintiff or her prescribing physicians were influenced by defendants' promotional conduct"); *Scharff v. Wyeth*, No. 2:10-CV-220-WKW, 2011 WL 4361634, at *15 (M.D. Ala. Sept. 19, 2011) ("[E]vidence regarding Wyeth's alleged distortion of doctors' risk/benefit analysis through its marketing representatives, ghost-written medical articles, Dear Doctor letters, promotion materials, and conferences" was "not relevant" because plaintiff failed to "produce[] evidence that [her physician] relied on any of this 'distorted' evidence when he prescribed Prempro to [her]."); *In re Viagra Prods. Liab. Litig.*, 658 F. Supp. 2d 950, 966 (D. Minn. 2009) (excluding expert testimony on marketing because expert's "speculation that Plaintiffs most likely saw the advertisements is different than evidence that Plaintiffs actually saw the advertisements. Absent that evidence," the testimony is "irrelevant and excludable."); *Miller v. Pfizer, Inc.*, 196 F. Supp. 2d 1095, 1123 n. 92 (D. Kan. 2002) (excluding marketing materials not relied on by prescriber "because they were irrelevant and unfairly prejudicial"), *aff'd*, 356 F.3d 1326 (10th Cir. 2004).

Dr. Handelsman has "[n]o idea" whether the marketing materials provided to him by counsel were ever used in the field, much less relied on by Plaintiffs and their prescribers. Handelsman Dep. at 280:18–21. In fact, there is no evidence that Plaintiffs or their prescribing physicians saw, much less relied on, those marketing materials.

Both Plaintiffs testified that they did not see or rely on any Testim advertisements prior to using Testim. Holtsclaw Dep. ("Ex. 20") at 29:19–21, 180:4–11, 240:20–241:5, 241:17–242:9; I. Owens Dep. at 283:13–17; Owens First Amended Plaintiff Fact Sheet ("Ex. 21") at 16–17. Likewise, there is no evidence that their prescribing physicians relied on any of the marketing materials that Dr. Handelsman reviewed. Dr. Dennis N. Smith, Mr. Holtsclaw's prescribing physician, testified that he did not recall sales representatives encouraging him to "look[] for patients for testosterone replacement," including by "encouraging [him] to test men for low testosterone if they had comorbidities of, say, diabetes" or [o]pioid use." D. Smith Dep. at 68:2–20. And Dr. Marion Dean McLaughlin, Mr. Holtsclaw's prescribing physician, also denied that any Auxilium sales representatives encouraged him to prescribe Testim to treat comorbid conditions. McLaughlin Dep. ("Ex. 22") at 106:10–108:2, 133:5–13.

### b. "Pharmaceutical Industry" Marketing and Promotion is Irrelevant

At a minimum, Dr. Handelsman should be precluded from offering opinions about the "pharmaceutical industry" or "testosterone product sellers or marketers" generally. *See*, *e.g.*, Handelsman Report at 3, ¶¶ 16–19; Handelsman Dep. at 217:21–24 (Auxilium "benefitted from the advertising and promotion of other [manufacturers] because [testosterone is] a generic drug essentially"). The "pharmaceutical industry" is not a defendant. Defendants can be liable only for their own actions. Testimony about the pharmaceutical industry generally or marketing not specific to Defendants is irrelevant. In addition, its introduction would be unduly prejudicial and inadmissible under Rule 403 because it would expose Defendants to liability for actions for

which they are not legally responsible. Accordingly, the Court should exclude Dr. Handelsman's generalized opinions regarding the pharmaceutical industry.

### C. The Court Should Exclude Dr. Handelsman's Speculation About the Intent of FDA or Auxilium

Dr. Handelsman also purports to opine about the state of mind of third parties and meaning of plainly worded documents. For example, quoting from an Auxilium-produced document supplied to him by Plaintiffs' counsel, Dr. Handelsman opines that Auxilium supposedly "documented" the "experimental nature of treatment [for] late-onset hypogonadism (LOH) and its synonymous conditions." Handelsman Report at 66; *see* Handelsman Dep. at 238:22–24. It does not require any scientific or technical expertise to read the document and draw inferences from it. Worse, and highlighting the danger of these mind-reading exercises, the document was not even prepared by Auxilium; it was prepared by Ipsen, which had obtained a license from Auxilium to market Testim in countries other than the United States, Canada, Mexico, and Japan. Ex. 23 at 22137. When confronted with that information, Dr. Handelsman conceded that "I'm not an expert in . . . such corporate affairs" and "I'm just not familiar with it." Handelsman Dep. at 240:13–24, 241:23–242:2.

In addition, although Dr. Handelsman admitted that he is not aware of any instance in which FDA told Auxilium that its advertising was noncompliant with FDA regulations, he nevertheless testified that FDA implicitly had done so when it changed the class labeling for TRT medicines in 2015. *Id.* at 35:6–14. According to Dr. Handelsman, FDA was "constrained by legalities" because "they weren't going to name anybody; they weren't going to make accusations." *Id.* at 35:9–19. And he claimed that his opinion falls within his expertise because he reviewed the FDA's statements regarding the 2015 labeling and "[a]s a nonlawyer, it would be common sense to think that." *Id.* at 36:4–17.

The jurors do not need Dr. Handelsman to tell them what he claims they can infer from their "common sense." As this Court has held, "[t]estimony that would be unhelpful to a jury may be barred under Rule 702 and can be excluded under Federal Rule of Evidence 403." CMO 48, at *13. And "'testimony regarding intent . . . is even more likely to be unhelpful to the trier of fact' because the expert merely draws 'inferences from the evidence' that the jury could draw equally well." *Id.* (citation omitted).

Consistent with this Court's holding in CMO 48, numerous courts have held "state of mind" testimony inadmissible under Rule 702. *See*, *e.g.*, *In re C.R. Bard, Inc.*, 948 F. Supp. 2d 589, 611 (S.D. W. Va. 2013) ("Bard's knowledge, state of mind, . . . or other matters related to corporate conduct and ethics are not appropriate subjects of expert testimony because opinions on these matters will not assist the jury"); *In re Trasylol Prods. Liab. Litig.*, No. 08-MD-01928, 2010 WL 4052141, at *8 (S.D. Fla. May 12, 2010) (Expert opinions concerning "knowledge, motive, intent, and state of mind . . . are inadmissible under Rule 702 and *Daubert* because they have no basis in any relevant body of knowledge or expertise and lie outside the proper bounds of expert testimony."); *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009) (Expert testimony as to "the knowledge, motivations, intent, state of mind, or purposes of Merck, its employees, the FDA, or FDA officials . . . is not a proper subject for expert or even lay testimony."); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004) ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony."); *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*, No. MDL 1203, 2000 WL 876900, at *9 (E.D. Pa. June 20, 2000) ("The question of intent is a classic jury question and not one for experts"). This Court should reiterate its holding in CMO 48 and exclude Dr. Handelsman's opinions about the intent of Auxilium and FDA.

**D.** **The Court Should Preclude Dr. Handelsman from Offering Opinions in Pejorative Terms**

In the AbbVie bellwether cases, this Court precluded Dr. Handelsman's opinions to the extent he expressed them using "pejorative adjectives" such as "'aggressive,' 'flamboyant' 'opportunistic,' and 'irresponsible.'" CMO 48, at *19. As the Court explained those terms are unfairly prejudicial under Rule 403 because they represent "value judgment[s] and . . . conclusion[s] that the jury can draw—or not draw—without being told to draw it." *Id.* at *17.

Dr. Handelsman uses the same pejorative terms to express his opinions in these cases.[9] The Court should preclude Dr. Handelsman from expressing his opinions in those pejorative and inflammatory terms for the same reasons it did in the AbbVie bellwether cases.

**V. THE COURT SHOULD EXCLUDE DR. PEGGY PENCE'S MARKETING OPINIONS**

Dr. Pence has a Ph.D. in toxicology. Pence Dep. ("Ex. 24") at 8:6–8. She is not a medical doctor. *Id.* at 8:9–10. Plaintiffs offer Dr. Pence to opine on Auxilium's conduct regarding Testim based on industry and regulatory standards relating to medicine approval, product labeling, marketing and promotional activities, and postmarketing surveillance. Report of Peggy Pence, Ph.D., RAC, FRAPS, dated July 18, 2017 ("Pence Report") ("Ex. 25") at ¶ 20. Among other things, Dr. Pence proposes to testify that "Auxilium's 'intended use' of Testim was

---

[9] *See, e.g.*, Handelsman Report at 3–5, ¶¶ 15 ("*aggressive* marketing and promotion of testosterone therapy"), 16 ("Promotion of testosterone therapy by the pharmaceutical industry, aided by and based upon *lax* and *permissive* professional society prescribing guidelines . . . was *opportunistic*, *irresponsible*, and *harmful* . . . .), 18 ("The pharmaceutical industry . . . *grossly* misstated the prevalence of 'hypogonadism), 19 ("The *extraordinary* boost . . . in testosterone prescribing is an exemplar of and was caused by the *predatory practice* by the pharmaceutical industry of '*disease mongering*'"), 28 ("medical literature which *massively* overstated the incidence of 'hypogonadism'"), 31 ("Marketing and promoting testosterone products in the ageing and elderly population for the treatment of conditions unrelated to classical hypogonadism without appropriate indicators of either safety or efficacy is *unconscionable*"), 33 (Auxilium's "activities should not be tolerated as it is, and has been recognized as, '*a mass, uncontrolled experiment*' performed *recklessly* for financial gain") (all emphasis added).

for indications that were not included in the class labeling for the product." *Id.* at ¶ 409 (Opinion #1). She also provides statements in her Report and testified at her deposition about Auxilium's "knowledge." *Id.* (Opinions #4, 5). And she intends to opine that "Auxilium improperly marketed and promoted Testim for off-label uses . . . and sold a misbranded product, in violation of federal regulations and the industry standard of care." *Id.* (Opinion #3). The Court should exclude those opinions.

**A.     The Court Should Exclude Dr. Pence's Speculation About Auxilium's Intent**

Dr. Pence's challenged opinions require her to divine Auxilium's intent from evidence from which the jury is equally capable of drawing inferences. For example, Dr. Pence proposes to testify that "Auxilium knew Testim was not approved to treat age-related or late-onset hypogonadism," and knew that it was being prescribed for those reasons. Pence Report at ¶ 232. In support of her opinion, she cites only testimony of Auxilium witnesses and internal company documents, *id.* at ¶¶ 233–36, 241, 245, 248–60, from which the jury can draw inferences without her assistance.

Dr. Pence also intends to testify about certain concerns that GlaxoSmithKline LLC ("GSK") expressed based on its internal policies during the short period of time when it was a party to a co-promotion agreement with Auxilium. Here too, Dr. Pence merely summarizes internal documents that require no particular expertise to understand, and contrasts marketing materials during and after the term of the co-promotion agreement. Pence Report at ¶¶ 366–408. She did not bother to review the testimony of a key GSK witness about GSK's conduct during the co-promotion agreement. Pence Dep. at 354:24–355:4. She concedes that GSK might have adopted stricter internal procedures than required by FDA regulations. *Id.* at 354:9–12. But she nevertheless concludes that Auxilium "should have listened to GSK and complied with GSK's reviews of the promotional labeling." *Id.* at 354:2–4. There is no reason why a jury cannot

consider the documentary evidence and testimony regarding the co-promotion agreement and come to its own conclusion about the significance, if any, of that evidence.

Dr. Pence also intends to testify that Testim was "misbranded" under FDA regulations based on her view of the "'intended use'" of Testim, which "refers to the objective intent of the persons legally responsible for drug labeling," *i.e.*, Auxilium. Pence Report at ¶ 286; Pence Dep. at 360:2–4. According to Dr. Pence, that "can be determined from multiple sources, including oral representations of the drug company or its sales representatives, advertising and promotional labeling, and the circumstances of drug distribution." Pence Report at ¶ 286. To divine Auxilium's intent, Dr. Pence proceeds to address internal company documents and marketing campaigns. *Id.* at ¶¶ 287–365. Her commentary consists of little more than quoting statements from straightforward promotional materials. *See*, *e.g.*, *id.* at ¶¶ 323–65.

Dr. Pence admits that ascertaining the "intended use" of a medicine and whether that medicine is "misbranded" under *federal* law falls within the exclusive province of FDA. Pence Dep. at 162:4–8, 360:5–15, 362:5–8. To the extent that Plaintiffs are seeking to impose liability on Defendants for violation of federal law or for an alleged fraud on FDA, those claims are preempted. *See Buckman v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 351–53 (2001). But even assuming that there were any reason for a jury to place itself in FDA's role of making that *federal* law determination to resolve Plaintiffs' *state* law claims (and there is not), Dr. Pence's testimony about what Auxilium promotional pieces say would not assist the jury to understand any technical or scientific information. There is no reason why the jury cannot draw inferences from the evidence to assess Auxilium's "objective intent" equally as well as Dr. Pence and without her input.

Dr. Pence admits that she has no expertise that allows her to explain what an FDA employee intended in a written document. Pence Dep. at 363:23–364:4. When asked that same question regarding Auxilium employees, however, Dr. Pence testified: "I base my opinions on the objective evidence." *Id.* at 364:6–12. But what she bases her opinions on is beside the point. To be admissible under Rule 702 and *Daubert*, her opinions must "help the trier of fact" to understand "scientific, technical, or other specialized" evidence. CMO 48, at *12; Fed. R. Evid. 702; *accord Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962) (expert testimony properly excluded "'if all the primary facts can be accurately and intelligibly described to the jury, and if they, as men of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience, or observation in respect of the subject under investigation'" (citation omitted)). Dr. Pence's foregoing opinions do not satisfy that standard. The Court should exclude them because Dr. Pence's proposed testimony would "usurp[] the role of the jury" as she "merely draws 'inferences from the evidence' that the jury could draw equally well." CMO 48, at *13 (citation omitted); *see also* Point IV.C, *supra*.

### B. The Court Should Exclude Dr. Pence's Marketing Opinions as Irrelevant Because There is No Evidence that Auxilium's Marketing Materials Influenced Plaintiffs or Their Prescribing Physicians

Like Dr. Handelsman, Dr. Pence opines on marketing materials that Plaintiffs and their prescribing physicians did not see and on which they did not rely. The Court should exclude her marketing opinions for the same reason the Court should exclude Dr. Handelsman's marketing opinions. *See* Point IV.B.2.a, *supra*.

**C.** **The Court Should Exclude Dr. Pence's Speculation Regarding FDA's Reasons for Acting or Not Acting**

Although Dr. Pence disclaims that she is "opining[] on FDA and how they fulfill their responsibilities," she nevertheless testified that "FDA has limited resources to accomplish its tasks, which are numerous. And based on those resources, they can accomplish so much." Pence Dep. at 155:21–156:3. And she testified that "I don't have any specific evidence with regard to [whether FDA made statements or wrote letters saying that they had limited resources to review a Testim promotional piece]. But, generally speaking . . . if they have limited resources overall, it can have an impact for Testim as well." *Id.* at 157:1–8.

This Court previously excluded the same opinion: "Dr. Pence lacks a sufficient basis to testify regarding why FDA acted (or failed to act) and . . . this particular opinion would be inadmissible in any event, either as speculative, unhelpful to the jury, or unfairly prejudicial under Rule 403." CMO 48, at *16. The Court should exclude the same opinion here.

**VI.** **THE COURT SHOULD EXCLUDE DR. STEVEN WOLOSHIN'S OPINIONS**

Dr. Woloshin is a medical doctor and Professor of Medicine and Community and Family Medicine at the Geisel School of Medicine at Dartmouth. Report of Steven Woloshin, M.D., MS, dated July 15, 2017 ("Woloshin Report") ("Ex. 26") at ¶ 1, CMO 48, at *17. Based on his review of the Auxilium witness testimony and company documents, Dr. Woloshin intends to testify that Auxilium engaged in "disease mongering," which he defines as "the effort to convince people that they are 'sick' and need a medical treatment for this 'sickness.'" Woloshin Report at ¶ 32. His report consists almost exclusively of "examples, citations, and quotes from the vast body of corporate depositions, corporate documents, and other sources that were reviewed during the preparation of this report." *Id.* at ¶ 64. The Court should exclude Dr.

Woloshin's opinions for many of the same reasons that the Court should exclude the duplicative opinions of Drs. Handelsman and Pence discussed above.

First, Dr. Woloshin's testimony is irrelevant because there is no evidence that Plaintiffs and their prescribing physicians saw or otherwise were influenced by the marketing materials that Dr. Woloshin reviewed. *See* Points IV.B.2.a, V.B, *supra*. Dr. Woloshin's testimony regarding "direct-to-consumer advertising" and "consumer questionnaires" that supposedly "drive" patients "to request testing and treatment"—Woloshin Report at ¶¶ 41, 43, 254, Woloshin Dep. ("Ex. 27") at 141:15–142:10—will not assist the jury when neither Mr. Holtsclaw nor Mr. Owens requested treatment for low testosterone and neither saw or relied on any Testim advertisements prior to using Testim. That testimony would confuse the jury and prejudice the Defendants. Similarly, there is no connection between the marketing materials that Dr. Woloshin reviewed and Plaintiffs' prescribing physicians, both of whom testified that Auxilium did not market Testim to them for the treatment of comorbid conditions or symptoms of low testosterone.

Second, like Dr. Handelsman, Dr. Woloshin expresses opinions about actions of the pharmaceutical industry generally or other pharmaceutical manufacturers that cannot support liability against Defendants. For example, Dr. Woloshin offers the opinion that "disease awareness marketing strategies [of any manufacturer] expanded the market for all sellers of prescription testosterone products" and that "Auxilium specifically advantaged the disease awareness marketing campaigns by the AndroGel sellers." Woloshin Report at ¶¶ 44–45. Auxilium cannot be held liable for the disease awareness campaign of another manufacturer regardless of whether the campaign provided some incidental benefit to Auxilium. Dr. Woloshin should not be permitted to suggest otherwise.

Finally, as the Court held in connection with Dr. Woloshin's proposed testimony in the AbbVie bellwether cases: "'Disease mongering' may be a catchy term, but if it is a term of art, it is one that Dr. Woloshin apparently created himself, and it carries a pejorative connotation that . . . strays beyond what an expert may appropriately say." CMO 48, at *17. Dr. Woloshin also should be precluded from using other pejorative terms, such as his references to a "mass, uncontrolled experiment." Woloshin Report at § XII. Accordingly, the Court should preclude Dr. Woloshin from expressing his opinions using terms like "disease mongering" and "mass, uncontrolled experiment."

## CONCLUSION

For the foregoing reasons the Court should exclude the proposed testimony of Plaintiffs' experts described above under Federal Rule of Evidence 702 and 403.

Dated: September 11, 2017        Respectfully submitted,

/s/ Andrew K. Solow
Andrew K. Solow (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
25O West 55th Street
New York, NY 10019-9710
Phone: (212) 836-7740
Fax: (212) 836-6776
Email: andrew.solow@apks.com

Pamela J. Yates (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844
Phone: (213) 243-4178
Fax: (213) 243-4199
Email: pamela.yates@apks.com

*Attorneys for Endo Pharmaceuticals Inc.,
Auxilium Pharmaceuticals, LLC (f/k/a Auxilium
Pharmaceuticals, Inc.), and GlaxoSmithKline
LLC*

**CERTIFICATE OF SERVICE**

I, Andrew K. Solow, certify that on September 11, 2017, I served a true and correct copy of the foregoing Defendants' Motion and Memorandum of Law in Support of Motion to Exclude Expert Testimony Under Federal Rules of Evidence 702 and 403 on counsel of record by electronic notice through the CM/ECF system of the United States District Court for the Northern District of Illinois.

Dated: September 11, 2017                 _Andrew K. Solow_____
                                          Andrew K. Solow (*pro hac vice*)

64745280