IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE: TESTOSTERONE REPLACEMENT THERAPY PRODUCTS LIABILITY LITIGATION | MDL No. 2545<br>Master Docket Case No. 1:14-cv-01748<br>Honorable Matthew F. Kennelly |
| This document applies to:<br>All Cases | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION OF AUXILIUM DEFENDANTS FOR SUMMARY JUDGMENT ON THE GROUND THAT PLAINTIFFS' STATE LAW FAILURE-TO-WARN AND DESIGN DEFECT CLAIMS ARE PREEMPTED BY FEDERAL LAW**

Ronald Johnson, Jr.
SCHACHTER, HENDY & JOHNSON PSC
909 Wrights Summit Parkway, Suite 210
Ft. Wright, KY 41011
Phone: (859) 578-4444
Fax: (859) 578-4440
Email: rjohnson@pschacter.com

Trent B. Miracle
SIMMONS HANLY CONROY
One Court Street
Alton, IL 62002
Phone: (618) 259-2222
Fax: (618) 259-2252
Email: tmiracle@simmonsfirm.com

Christopher A. Seeger
SEEGER WEISS LLP
77 Water Street
New York, NY 10005
Phone: (212) 584-0700
Fax: (212) 584-0799
Email: cseeger@seegerweiss.com

Plaintiffs' Co-Lead Counsel *on behalf of* Plaintiffs' Steering Committee

October 2, 2017

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ................................................................................ II

INTRODUCTION ........................................................................................... 1

RELEVANT FACTUAL HISTORY ..................................................................... 2

    The TOM Trial .......................................................................................... 3

    Safety Label Change Notification Request ............................................... 3

    Public Citizen Petition ............................................................................. 4

LEGAL STANDARD ....................................................................................... 5

ARGUMENT ................................................................................................. 5

    I.    CONFLICT PREEMPTION IS A DEMANDING DEFENSE THAT REQUIRES "CLEAR EVIDENCE" .................................................. 5

    II.    AUXILIUM CANNOT MEET ITS BURDEN TO SATISFY *WYETH'S* AND *MASON'S* STRICT STANDARD FOR CONFLICT PREEMPTION ..................... 8

        A.    Auxilium Is Unable to Show that the FDA Would Have Rejected an Attempt to Add a CV Risk Warning to Testim's Label ........................... 8

            1.    *The FDA's Reaction to the TOM Trial Does Not Warrant Preemption* ........................................................................... 9

            2.    *The FDA's Denial of the 2014 Public Citizen Petition is not Grounds for Summary Judgment* ........................................ 10

            **3.**    *The Prior Approval Supplement Language Proposed by Auxilium Did Not Represent a Cardiovascular Risk Warning and its Denial by the FDA Is of No Consequence* .................... 12

        B.    Auxilium Has Not Shown that the FDA Would Have Rejected an Attempt to Add a VTE Warning to Testim's Label ....................... 15

        C.    Auxilium Fails to Address the Additional Warnings that Plaintiffs Contend Were Required ..................................................... 16

    III.    PLAINTIFFS' DESIGN DEFECT CLAIMS ARE NOT PREEMPTED. ................. 17

CONCLUSION .............................................................................................. 19

i

# TABLE OF AUTHORITIES

## Cases

*Cerveny v. Aventis, Inc.*, 855 F.3d 1091 (10th Cir. 2017) ...................................................... 10, 11

*Esdale v. Am. Cmty. Mut. Ins. Co.*, 914 F. Supp. 270 (N.D. Ill. 1996).......................................... 5

*Guidry v. Janssen Pharms., Inc.*, 206 F. Supp. 3d 1187 (E.D. La. 2016).................................... 19

*Harley-Davidson Motor Co. v. PowerSports, Inc.*, 319 F.3d 973 (7th Cir. 2003) ....................... 5

*In re Actos (Pioglitazone) Prods. Liab. Litig.*, 2014 WL 4364832 (W.D. La. 2014).................. 6

*In re Fosamax (Alendronate Sodium) Prods. Liab. Litig.*, 852 F.3d 268 (3d Cir. 2017) .............. 9

*In re Testosterone Replacement Therapy Prod. Liab. Litig. Coordinated Pretrial Proceedings*,
    No. 14 C 1748, 2017 WL 1836435 (N.D. Ill. May 8, 2017) ............................................ passim

*Mason v. Smithkline Beecham Corp.*, 546 F.Supp.2d 618 (C.D. Ill. 2008).................................. 7

*Mason v. SmithKline Beecham Corp.*, 596 F.3d 387 (7th Cir. 2010) ................................... passim

*Mutual Pharm. Co. v. Bartlett,* 133 S. Ct. 2466 (2013)............................................................. 17

*Wyeth v. Levine*, 555 U.S. 555 (2009) ................................................................................ passim

*Yates v. Ortho-McNeil-Janssen Pharms., Inc.*, 808 F.3d 281 (6th Cir. 2015)...................... 17, 18

*Young v. Bristol-Myers Squibb Co.,* No. 4:16-CV-00108-DMB-JMV, 2017 U.S. Dist. LEXIS
    24730 (N.D. Miss. Feb. 22, 2017) ......................................................................................... 18

*Page*

## INTRODUCTION

In the instant motion, Defendants, Auxilium Pharmaceuticals, LLC (f/k/a Auxilium Pharmaceuticals, Inc.), Endo Pharmaceuticals Inc., and GlaxoSmithKline LLC (together, "Auxilium" or "Defendants"), attempt to rehash the exact same conflict preemption argument that this Court has already considered and rejected. *See In re Testosterone Replacement Therapy Prod. Liab. Litig. Coordinated Pretrial Proceedings*, No. 14 C 1748, 2017 WL 1836435, at *7-12 (N.D. Ill. May 8, 2017) (CMO 47).[1]

Indeed, this Court has already held that the Food and Drug Administration's ("FDA") findings relative to Basaria's Testosterone in Older Men ("TOM") trial published in the *New England Journal of Medicine* and the Public Citizen Petition ("Petition") are *not* "clear evidence" that the FDA would have rejected attempts by Auxilium to change Testim's label. *See id*; *see also Wyeth v. Levine*, 555 U.S. 555 (2009). Auxilium provides no new basis that warrants revisiting this issue.[2]

In an attempt to distinguish their Motion from AbbVie's failed preemption argument, Defendants point to an alleged rejection by the FDA of a vague Prior Approval Supplement warning, which Defendants claim encompassed cardiovascular ("CV") events. However, the FDA rejected Auxilium's Prior Approval Supplement because it did not respond to the request made by the FDA and, more importantly for the purposes of this Motion, the FDA did not even consider arterial thromboembolic events—like strokes and heart attacks—when it reviewed Auxilium's Prior Approval Supplement:

---

[1] Defendants have failed to comply with Local Rule 56.1's statement of material fact requirement. Their 10-page section entitled "Statement of Undisputed Facts" fails to include any numbered paragraphs, and seems better characterized as a "Background" or "Introduction" section. Plaintiffs therefore have no corresponding responses thereto.

[2] Defendants' brief seems to imply that the fact that their Testosterone Replacement Therapy ("TRT") product, Testim, was used in the TOM trial somehow calls for a different analysis or result. It does not. The drug involved had no bearing on the Court's preemption denial as it related to the TOM study. *See In re Testosterone*, 2017 WL 1836435 at *7-12.

1

> We do not concur with the more general text of "thrombosis and embolic events." FDA's requested labeling changes were based on our review of cases of *venous* thromboembolism (DVT, PE), and not arterial thromboembolism (strokes, heart attacks). Therefore, we believe "venous thromboembolism" is the most accurate text, clinically and scientifically, to describe the said warning.

*See* Defendants' Motion for Summary Judgment on the Ground that Plaintiffs' Failure-to-Warn and Design Defect Claims are Preempted and Memorandum of Law in Support (hereinafter, "Def. Mot."), Doc. No. 38, at Ex. 1 (emphasis in original). The FDA could not have been more clear — it did not even consider Auxilium's Prior Approval Supplement to be a CV warning and, therefore, its rejection of Auxilium's proposed language was *not* clear evidence that Plaintiffs' proposed CV warnings would have been rejected by the FDA.

Defendants also claim that because the FDA never found reasonable evidence of a causal connection between testosterone replacement therapy ("TRT") and venous thromboembolic events ("VTE"), that they would not have been permitted to unilaterally update Testim's label to warn of a VTE risk. This is entirely untrue. First, credible evidence links TRT to VTE. Second, this Court has already ruled that a definitive causal connection does not need to exist before a drug company is able to update its label. *See In re Testosterone*, 2017 WL 1836435 at *9 (CMO 47 at 19-20). Defendants' arguments regarding Plaintiffs' design defect claims must also fail because Defendants have not shown that these claims are preempted.

Conflict preemption has already been addressed and denied by this Court. Defendants offer no new or unique evidence or argument that would permit a different outcome. For these reasons, and those that follow, Plaintiffs respectfully request that Defendants' Motion be denied.

## RELEVANT FACTUAL HISTORY

In order to streamline this response, Plaintiffs are limiting the factual recitation to those facts upon which Auxilium relies on in its Motion for Summary Judgment.

**The TOM Trial**

The Testosterone in Older Men with Mobility Limitations ("TOM") Trial was a double-blind, randomized controlled trial that compared Testim to placebo. The TOM Trial was not originally designed to evaluate cardiovascular safety or risk; it was intended to study whether TRT could increase strength and physical function in a population of older men with mobility limitations. However, the Data Safety Monitoring Board overseeing patient safety halted the trial because: "the incidence of clinically important cardiovascular events was significantly higher in the testosterone than in the placebo group." *See* OHRP Letter, Ex. 1 at 3.

In January 2010, testosterone safety became a Tracked Safety Issue ("TSI")[3] after the FDA was notified of the discontinuation of the TOM Trial. *See* Def. Mot., Ex. 12. While the FDA did not ultimately require a label change as a result of the TOM study, the FDA's Division of Epidemiology ("DEPI") reviewed the TOM trial and other studies and "observed that the studies highlight some trends that could represent signals of unknown effects of TRT in certain age and disease groups of treated men. The observed trends include a possible increased risk of cardiovascular events . . . ." *See* May 21, 2010 DEPI Report on TRT and Risk of CV Disease, Ex. 2. The DEPI reviewer stated that additional studies were needed. *See id.* In a follow up review performed by DEPI in December 2010, it noted that the "only study to evaluate actual cardiovascular events, such as myocardial infarction, observed a difference between groups with an increased incidence occurring in the testosterone treatment arm." *See* December 21, 2010 DEPI Report on TRT and Risk of CV Disease, Ex. 3.

**Safety Label Change Notification Request**

On March 26, 2014, the FDA issued a "Safety Labeling Change Notification" to Auxilium that stated: "Since Testim was approved on October 31, 2002, we have become aware of new

---

[3] A TSI is an FDA-generated application created for the purpose of tracking and archiving regulatory activities associated with a significant safety issue related to a marketed prescription or over-the-counter drug.

safety information related to the serious risk of venous thromboembolic events associated with testosterone use." *See* March 26, 2014 Safety Labeling Change Notification, Ex. 4. In light of this finding, the FDA's notification continued:

> . . . [W]e believe that the new safety information *should be included consistently* in the labeling for testosterone products as follows:
> * * *
>
> Testosterone use may increase the risk of venous thromboembolism (VTE), including deep vein thrombosis (DVT) and pulmonary embolism (PE). Consider VTE in patients with signs or symptoms consistent with DVT or PE. (5.4)

*Id.* (emphasis added).

Instead of complying with the FDA's directive, Auxilium submitted a counter proposal that Testim's label not use the term "venous thromboembolism," but instead use the more general terms "embolism and thrombosis." *See* Def. Mot., Ex. 24. The FDA denied Auxilium's proposal because it was not responsive to the FDA's exact request that the label be "consistently" updated with a warning regarding a very specific injury — venous thromboembolic events:

> We do not concur with the more general text of "thrombosis and embolic events." FDA's requested labeling changes were based on our review of cases of **venous** thromboembolism (DVT, PE), and not arterial thromboembolism (strokes, heart attacks). Therefore, we believe "venous thromboembolism" is the most accurate text, clinically and scientifically, to describe the said warning.

Def. Mot., Ex. 1. (emphasis in original communication from the FDA to Auxilium). In other words, in March 2014 the FDA was not considering whether Testim's label should be updated to reflect a cardiovascular risk.[4]

**Public Citizen Petition**

In February 2014, the consumer organization Public Citizen petitioned the FDA to add a black-box warning to all TRT drugs, not just Testim, to reflect their capacity to increase the risk

---

[4] As the Court is aware, when the FDA ultimately did consider whether a CV warning was appropriate later in 2014 (in connection with the September 2014 Advisory Committee Meeting), the FDA found that such a warning was in fact appropriate and required Auxilium to update its label to add a CV warning to its label, which was added on May 11, 2015.

of heart attacks and other cardiovascular dangers.  *See* Def. Mot., Ex. 26.  The Petition did not seek to add a regular, non black-box warning, nor did it seek to add warnings regarding the lack of clinical safety trials performed on TRT drugs or a warning related to the lack of established safety and efficacy of TRT use in men with age-related hypogonadism.  *Id.*  The FDA ultimately "*decline[ed] to exercise its authority to require* safety labeling changes regarding these risks on the basis of the evidence presented in the Petition . . . ."  *See* Def. Mot., Ex. 9 (emphasis added).  Notably, the FDA did not find that TRT manufacturers should not update their labels, but rather found that based on the evidence presented, the FDA did not find it warranted to *require* all TRT manufacturers to update their labels with a black-box warning at that time.  *See id.*

**LEGAL STANDARD**

On a motion for summary judgment, "[t]he moving party bears the burden of establishing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law." *Esdale v. Am. Cmty. Mut. Ins. Co.*, 914 F. Supp. 270, 271 (N.D. Ill. 1996). At summary judgment, the underlying facts are reviewed in the light most favorable to the nonmoving party.  *Harley-Davidson Motor Co. v. PowerSports, Inc.*, 319 F.3d 973, 989 (7th Cir. 2003).  "'The choice between reasonable inferences from facts' is a function of a fact-finder, and when multiple reasonable inferences exist on a genuine issue of material fact, summary judgment will not be appropriate." *Id*.

**ARGUMENT**

## I. CONFLICT PREEMPTION IS A DEMANDING DEFENSE THAT REQUIRES "CLEAR EVIDENCE"

Conflict preemption is rarely found because federal regulatory law, much like state law, holds a drug manufacturer responsible for the content of its label at all times.  *See Wyeth v. Levine*, 555 U.S. 555, 570-71 (2009).  To that end, the "changes being effected" (CBE) regulation instructs that a drug manufacturer may unilaterally change its label "to reflect newly acquired information,"

5

for example, by "add[ing] or strengthen[ing] a contraindication, warning, precaution, or adverse reaction," or by "add[ing] or strengthen[ing] an instruction about dosage and administration that is intended to increase the safe use of the drug product." *See Wyeth*, 555 U.S. at 568 (*citing* § 314.70(c)(6)(iii)). Once the manufacturer submits its supplemental application to the FDA, the new label may be disseminated immediately, unless and until the FDA intervenes to instruct otherwise. *See id*.

Against this backdrop, a drug manufacturer bears a heavy burden when arguing that federal requirements made it impossible to strengthen its label. *Wyeth,* 555 U.S. at 573. ("Impossibility pre-emption is a demanding defense."). To show impossibility, the manufacturer must come forward with "clear evidence" that if it had updated its label pursuant to its duties under state tort law and federal regulations, the FDA would have intervened and rejected the label change. *See Wyeth*, 555 U.S. at 571. The court can only grant summary judgment on the basis of conflict preemption where, resolving all questions of fact in the Plaintiffs' favor, the administrative record clearly shows the FDA would not have allowed the label change. *See*, *e.g.*, *In re Actos (Pioglitazone) Prods. Liab. Litig*., 2014 WL 4364832, at *21–22 (W.D. La. 2014) (holding that, in preemption analysis, court's role is not "to substitute its judgment for the jury's or to weigh evidence, make credibility calls, or to select which interpretation of the evidence presented might be more desirable . . . .").

The Seventh Circuit strictly applies the "clear evidence" standard. Under *Wyeth*, the test for manufacturers seeking to establish FDA preemption is stringent. *Mason v. SmithKline Beecham Corp.,* 596 F.3d 387, 391 (7th Cir. 2010). The *Mason* Court rejected GlaxoSmithKline's ("GSK") assertions that it would have been impossible to add a warning about the risk of suicide to the Paxil label prior to 2003. *Mason*, 596 F.3d at 387. The Court was unpersuaded by the record evidence that the FDA had approved Paxil without a warning about suicide in 1989, and that over

the years, the FDA had considered the data and concluded there was insufficient evidence to support a warning about the risk of suicide. *See id*. at 394-96. The Court found it was still not clear the FDA would have rejected a CBE labeling change to add a warning about suicide to the Paxil label before 2003.

The *Mason* Court focused on the timeframe between Paxil's initial approval and 2003, the year the plaintiffs' decedent ingested Paxil. *Id*. GSK claimed that, as of 2003, the FDA had reviewed all available data and concluded there was no increased risk of self-harm associated with Paxil's drug class (SSRI's). *Id*. at 394-95. The Court focused on GSK's citation to the FDA's denials of citizen petitions relating to the risk of suicide associated with a different SSRI, Prozac, in 1991, 1992, and 1997. *Id*.; *see also Mason v. Smithkline Beecham Corp.*, 546 F.Supp.2d 618, 624 (C.D. Ill. 2008) (discussing the citizen petitions in greater detail). The court found the record was "not as clear-cut" as GSK suggested:

> During a meeting of the FDA's psychopharmacological drug committee, Dr. Paul Leber—the Director of the Division of Neuropharmacological Drug Products—gave a presentation about the potential link between suicide and antidepressants and stated, '[N]obody in the agency dismisses the possibility that antidepressants in general and fluoxetine in particular may have—and I emphasize 'may'—the capacity to cause untoward injurious behaviors, acts, and/or intensify them.' Additionally, in the very letter that rejected a citizen petition to change the label on Prozac, the FDA noted that more research needs to occur to explore the relationship between antidepressants and suicidality.

596 F.3dat 394-95. Like the FDA's actions here with respect to Testim and other TRT products, the *Mason* Court concluded the FDA's responses were a call for more research and did not preempt the plaintiffs' failure to warn claims. *Id*. at 395. In sum, the Seventh Circuit found the plaintiffs' claims were not preempted by "the FDA's inaction, as in its failure to mandate a warning" after repeatedly considering the possibility of a connection between Paxil and suicide throughout the 1990's-early 2000's. *See id*.

Both *Wyeth* and *Mason* require a finding against preemption in this case.

7

## II. AUXILIUM CANNOT MEET ITS BURDEN TO SATISFY *WYETH'S* AND *MASON'S* STRICT STANDARD FOR CONFLICT PREEMPTION

Given these legal precedents and regulatory frameworks, the narrow question before this Court is: whether Auxilium has proven by clear evidence that an enhanced warning was impossible—that is, proven by clear evidence that the FDA would have intervened and rejected a unilateral label change to the Testim label prior to 2013.[5] *See Wyeth*, 555 U.S. at 571. The answer to this question is a definitive "no." At best, Auxilium has pointed to a hodgepodge of evidence that the FDA considered information relating to the risks of CV and VTE but did not require the Testim label to warn of the same until 2014-2015.[6] But under *Wyeth* and *Mason*, this purported evidence does not establish that the FDA would have precluded Auxilium from adding CV or VTE warnings, or others, by submitting a CBE label change.[7]

### A. Auxilium Is Unable to Show that the FDA Would Have Rejected an Attempt to Add a CV Risk Warning to Testim's Label

Auxilium identifies three facts that says are proof that the FDA would have precluded them from adding a CV warning to Testim's label: (1) the FDA's failure to mandate a warning after the Basaria (TOM) study was discontinued in December 2009; (2) the FDA's failure to mandate a warning in response to the 2014 Public Citizen Petition regarding CV risk; and (3) the FDA's rejection of Auxilium's Prior Approval Supplement in 2014. Two of these three "facts"—the TOM trial discontinuation and the Public Citizen petition—were already raised by AbbVie and were summarily rejected by this Court. *In re Testosterone*, 2017 WL 1836435 at *7-12 (CMO 47 at 14-30). The outcome here should be no different. The remaining contention raised by Defendants—

---

[5] 2013 is relevant here because bellwether Plaintiff Isaac Owens suffered a DVT on July 12, 2013 and bellwether Plaintiff Steve Holtsclaw suffered a myocardial infarction on July 3, 2014.

[6] Plaintiffs assert that Auxilium should have warned of cardiovascular ("CV") and venous thromboembolic ("VTE") events associated with Testim as well as warned about the lack of established safety and efficacy in certain populations of Testosterone Replacement Therapy ("TRT") users.

[7] Point II-A, including subparts 1, 2, and 3 addresses arguments Auxilium made relating to Mr. Holtsclaw's failure-to-warn claims and CV risk. Point II-B, below, addresses Auxilium's argument that relating to Mr. Owens' failure to warn claims and VTE risk.

Auxilium's Prior Approval Supplement—does not even remotely demonstrate "clear evidence" that the FDA would have rejected the label change. *See Mason,* 596 F.3d at 395; *Wyeth,* 555 U.S. at 571.

1.    *The FDA's Reaction to the TOM Trial Does Not Warrant Preemption*

Auxilium posits that when the FDA evaluated CV risk studies in 2010, it concluded the studies did not support an association between CV risk and TRT and that this shows "clear evidence" that the FDA would not have approved a CV warning. *See* Def. Mot. at 15-16. This very argument has already been considered and rejected when the Court analyzed AbbVie's preemption motion[8]:

> AbbVie points to the following determinations by the FDA:
>
> the FDA's conclusion in 2010 that the risk of cardiovascular disease "remains uncertain" following the publication of the Basaria article, FDA Memo Dec. 2010 at 2;
>
> * * *
>
> But the fact that the FDA was not "affirmatively convinced of a causal link between the drug and the adverse event" would not necessarily preclude AbbVie from adding the warning on its own. *See In re Fosamax (Alendronate Sodium) Prods. Liab. Litig*., 852 F.3d 268, 298 (3d Cir. 2017). As in Fosamax, the FDA recognized the possibility of a link with both cardiovascular and VTE risk, even though it ultimately concluded that the available literature did not support an association . . . . This evidence indicates a reasonable possibility "that the FDA would still have determined that 'reasonable evidence' of a link existed—or more precisely, that the possibility of rejection was less than highly probable." *Fosamax*, 852 F.3d at 298. AbbVie has therefore failed to meet the "clear evidence" standard.

*In re Testosterone*, 2017 WL 1836435 at *8-9 (CMO 47 at 19). Simply, Auxilium's re-argument of this already-settled issue changes nothing. Just as was the case with AbbVie, Auxilium would not have been prohibited from changing its label even though the FDA's position on TRT use and

---

[8] Auxilium argues that the FDA's inaction after the TOM study is somehow more relevant here because Testim was the drug that was used in the TOM study. This is an irrelevant and immaterial fact that played no role in the FDA's decision process and should not alter the Court's prior reasoning on this issue.

CV events was undecided.  As this Court previously found, Auxilium cannot rely on the FDA's inaction after the TOM study to meet the "clear evidence" standard.

> 2. *The FDA's Denial of the 2014 Public Citizen Petition is not Grounds for Summary Judgment*

Next, like AbbVie before it, Auxilium cites to the FDA's denial of the 2014 Public Citizen Petition as clear evidence that the FDA would have rejected attempts by Defendants to modify Testim's label.  *See* Def. Mot. at 15.  This Court has already held that the rejection of this Petition did "not constitute clear evidence that the FDA would have rejected an attempt by [Auxilium] to add the warnings that plaintiffs contend were wrongfully omitted." *In re Testosterone*, 2017 WL 1836435 at *11 (CMO 47 at 23-24).   Auxilium now makes the same failed argument hoping for a different outcome, even though there is no basis for a reconsideration of the Court's findings.

In denying the Petition, the FDA merely declined to require the most stringent type of warning—a black box warning—in addition to denying the request for "Dear Doctor" letters and changes to medication guides relating to heart attacks and other CV risks.  The FDA's response made clear its final determination regarding the safety of testosterone therapy was still pending. *See* Def. Mot., Ex. 9.  As in *Mason*, this lack of action is not "clear evidence" that Auxilium could not have changed the Testim label itself.   596 F.3d at 394-95 (failure to warn claims were not preempted where the FDA responded to a citizen petition by stating that additional research was needed).  Auxilium has failed to provide any evidence that the FDA was sufficiently convinced of the safety of Testim that it would actually have rejected any attempt to provide a warning about cardiovascular risk.

Auxilium, like AbbVie, relies on *Cerveny v. Aventis, Inc.*, 855 F.3d 1091 (10th Cir. 2017), for the proposition that the rejection of a citizens' petition "may" constitute clear evidence that the FDA would have rejected a manufacturers' initiated change to a drug label.  S*ee* Def. Mot. at 14.

But, as this Court pointed out, *Cerveny* is distinguishable. The Public Citizen Petition in *Cerveny* sought to add a warning for the precise drug at-issue in that case. Here, the Public Citizen Petition sought to add warnings to an entire class of drugs, not only Auxilium's Testim:

> Thus the FDA's rejection in *Cerveny* of the citizen petition's proposed warning for the precise drug at issue—i.e., a warning that was narrow and focused—constituted clear evidence that it would have rejected a similar attempt by the manufacturer. But the FDA's rejection in this case of the citizen petition's effort to modify the labels of "all testosterone-containing drugs" does not constitute clear evidence that the agency would have rejected an attempt by AbbVie to modify the warning label of only its own drug.

*In re Testosterone*, 2017 WL 1836435 at *11 (CMO 47 at 23.).

Furthermore, in *Cerveny*, the rejected Public Citizen Petition contained "arguments virtually identical to the" plaintiff's argument in that case. *See Cerveny*, 855 F.3d at 1103. Here, on the other hand, the 2014 Public Citizen Petition only asked for a black-box CV warning while Plaintiffs contend that CV, VTE, and general safety and efficacy warnings, whether they be black-box warnings or regular warnings, should have been added to Testim's label. Because the rejected 2014 Public Citizen Petition in this matter did not contain the same arguments that Plaintiffs here make, the rejection of that petition cannot provide clear evidence that the FDA would have rejected a request from Auxilium to add the warnings that Plaintiffs here seek.

Auxilium also argues that the FDA might have treated a proposal from a manufacturer differently than a proposal from a Public Citizen Petition. *See* Def. Mot. at 17. Yet, this Court already considered this possibility and denied preemption in light of the FDA's *own* language:

> Although the court in *Cerveny* rejected plaintiffs' argument that the FDA would have treated a request by the manufacturer differently than one in a citizen petition, *Cerveny*, 2017 WL 1573309 at *8–9, *the FDA's statements in this case indicate that, had the manufacturer come forward with a request to make further warnings, the FDA may have permitted the changes*. And irrespective of the rationale for the FDA's determination, its rejection of the warnings is not "clear-cut," *Mason*, 596 F.3d at 394, because the agency itself indicated the possibility of future action.

*In re Testosterone*, 2017 WL 1836435 at *10 (CMO 47 at 22) (emphasis added).

11

Lastly, Auxilium points to the lack of a "temporal gap" between when Mr. Holtsclaw suffered his injuries and when the Petition was denied.[9]  *See* Def. Mot. at 15.  Auxilium contends that because the Petition was denied after Mr. Holtsclaw's injury, this is clear evidence that the FDA would not have allowed Auxilium to add a CV risk warning at any time prior to Mr. Holtsclaw's injury.  However, the temporal relationship is a red herring; nowhere in *Mason* did the court state that the denial of a citizen petition *after* a plaintiff suffers injury constitutes clear evidence that the FDA would have rejected a drug manufacturers' earlier request to add a warning to its label.  In fact, the *Mason* court recognized the opposite — that the FDA's action of requiring warnings *after* a person suffers injury *supports* the finding that the FDA would not have rejected a manufacturers' request to add warnings at an earlier time:

> Then, in May of 2007, the FDA ordered all antidepressant manufacturers to include an additional warning about the increased likelihood of suicidality in young adults under the age of 24 . . . Since these events occurred well after Tricia's suicide, they are not persuasive in determining whether there was clear evidence that the FDA would have rejected the proposed warning at the time of Tricia's death. To the extent these subsequent events have any sway, however, they clearly cut towards making it less likely that the FDA would have rejected the plaintiffs' proposed warning in 2003.

*Mason*, 596 F.3d at 395.

Here, the FDA required all TRT manufacturers to update the warning sections of their labels to reflect a CV risk.  This subsequent action by the FDA clearly "cut towards making it less likely that the FDA would have rejected" adding a CV risk warning prior to Mr. Holtsclaw's myocardial infarction.

**3.**     *The Prior Approval Supplement Language Proposed by Auxilium Did Not Represent a Cardiovascular Risk Warning and its Denial by the FDA Is of No Consequence*

Crucially, Auxilium does not point to any instance where it actually proposed, and the FDA actually rejected, a stronger warning about CV risk.  The factual record is silent in this regard

---

[9] Only Mr. Holtsclaw suffered his injury after the denial of the Public Citizen Petition.  Mr. Owens suffered his injury prior its denial.

because it does not exist. Instead, Auxilium cites to a single instance where it was asked by the FDA to specifically add a specific warning about VTE risk, but instead proposed an overly broad and vague warning that neither responded to the FDA's request nor reflected a CV risk warning. *See* Def. Mot. at 10.

In March 2014, the FDA sent Auxilium a Safety Labeling Change Notification advising Auxilium that it had "become aware of new safety information related to the serious risk of venous thromboembolic events associated with testosterone use." *See* March 26, 2014 FDA Safety Labeling Change Notification, Ex. 4. In this communication, the FDA asked Auxilium to add the following statement to Testim's warning/precaution section: "Testosterone use may increase the risk of venous thromboembolism (VTE), including deep vein thrombosis (DVT) and pulmonary embolism (PE). Consider VTE in patients with signs or symptoms consistent with DVT or PE." *Id.* In response to this request, Auxilium informed the FDA that they disagreed with its proposal and asked if they could to use the term "embolism and thrombosis" instead of "venous thromboembolic events" or "VTE." Def. Mot., Ex. 24. Auxilium asserts that "[t]his term is a MedDRA high level group term (HLGT) in the vascular organ class, which includes the preferred terms of deep vein thrombosis (DVT), pulmonary embolism (PE), and thrombosis, and the LLT of VTE." *Id*.

In rejecting Auxilium's proposal, the FDA made clear that Auxilium's proposal was not responsive to the FDA's safety label change notification. *See* Def. Mot., Ex. 1. Further, the FDA stated that its labeling change request was "based on review of cases of *venous* thromboembolism (DVT, PE), *and not arterial thromboembolism (strokes, heart attacks)*. Therefore, we believe *'venous thromboembolism' is the most accurate text, clinically and scientifically*, *to describe the said warning*." *Id.* (Emphasis added and in original).

13

Auxilium now claims this event amounts to clear evidence that the FDA would not have allowed it to alter Testim's label to include a CV risk warning at any time prior to Plaintiff Holtsclaw's injuries. This argument, respectfully, makes zero sense. First, the warning was denied because it was not at all responsive to the FDA's request, which was for language to address the VTE risk. Second, the language Defendants proposed did not even include the words cardiovascular, myocardial infarction, heart attack, stroke, or arterial thromboembolic events. As no direct and clear language was proposed by Auxilium to specifically warn for cardiovascular events related to Testim, it is not plausible that Auxilium now seeks preemption given the generic, ambiguous, and vague "embolism and thrombosis" language it proposed. Auxilium has presented no evidence that, had it proposed a CV warning separate and apart from the FDA's request concerning a VTE warning, that warning would have been rejected.

Further, there is no record evidence that Auxilium later asked the FDA for permission to update its label to warn of CV risk. Had Auxilium truly meant "embolism and thrombosis" to reflect a CV warning—which again is unsupported by logic or evidence—it could have pressed its position and proposed the same to the FDA in a circumstance other than in response to a request concerning a VTE warning. But Auxilium did not take that step. Accordingly, Auxilium cannot escape liability though the doctrine of impossibility preemption. *See Aaron v. Wyeth,* 2010 WL 653984, *6 (W.D. Pa. 2010) (finding preemption was not established where the company did not "press its position" and instead "acquiesced" to the requests made by the FDA.)

In sum, the rejection of the less specific "embolism and thrombosis" language in response to a specific request by the FDA to add language about VTE risks can hardly be said to be "clear evidence" that FDA would not have permitted Auxilium to add additional warnings relating to CV risk.

14

**B.  Auxilium Has Not Shown that the FDA Would Have Rejected an Attempt to Add a VTE Warning to Testim's Label.**

Auxilium seeks to dismiss Plaintiff Owens's failure-to-warn claim, contending that the FDA never found "reasonable evidence of a causal association" between VTE and Testim. Auxilium maintains that this is "clear evidence" that the FDA would not have approved a labeling change to add VTE warnings.  Def. Mot. at 2, 16.  Further, Auxilium argues that because the FDA did not mandate a VTE-risk class label change until after Mr. Owens' injury, the FDA would not have permitted a label change by Auxilium at any earlier time.

The holding in *Mason* refutes these arguments.  The FDA's uncertainty about the existence of a connection between Testim and VTE and its inaction prior to 2014 does not constitute clear evidence the FDA would have prevented Auxilium from warning about the risk of VTE associated with Testim prior to 2014.  596 F.3d at 394-95; *see also In re Testosterone,* 2017 WL 1836435 at *8 (characterizing the *Mason* holding as: "finding that 'the FDA's inaction, as in its failure to mandate a warning about the risk,' does not support granting summary judgment on preemption."). *Mason* makes clear that mere inaction by the FDA is insufficient to establish preemption.  Indeed, Auxilium's argument turns the holding of the Supreme Court in *Wyeth v. Levine* on its head.  In *Wyeth v. Levine*, the Supreme Court said that, while FDA labeling requirements set a "floor" for safety warnings, states are free to require additional warnings (through product liability laws), so long as the manufacturer could have added those warnings without running afoul of federal regulations. 555 U.S. at 578.  The argument that state-law claims are preempted whenever the FDA has failed to require the warnings at issue was expressly rejected in *Levine*, and Auxilium cannot contravene that, attempting to use the FDA's failure to require a VTE warning as a basis for preemption here.

### C.    Auxilium Fails to Address the Additional Warnings that Plaintiffs Contend Were Required.

CV and VTE risk warnings are not the only warnings that Plaintiffs contend Auxilium should have added to Testim's label.  Specifically, Plaintiffs' pharmaceutical expert, Peggy Pence, has opined that by 2004, Auxilium was duty-bound to add the following warnings to Testim's label:

> No clinical safety trials have been conducted to determine if Testim increases the risk of cardiovascular events (heart attack, stroke, and deep vein thrombosis) in patients with late-onset hypogonadism and cardiovascular risk factors.

> Safety and efficacy of Testim have not been shown in patients with late-onset hypogonadism (low testosterone due to aging and chronic illnesses).

*See* Plaintiffs' Expert Peggy Pence's Report, Ex.5 at ¶ 284, 439.  Auxilium's motion does not even acknowledge that portion of Plaintiffs' allegations.  Further, there is no record evidence that Auxilium actually attempted to add these or similar warnings and was denied by the FDA nor is there any indication in the record that, had Auxilium wanted to add these warnings, that they would have been rejected by the FDA.  The burden is on Auxilium to present "clear evidence" that the FDA would have rejected an attempt by Auxilium to add the above warning to Testim's label:

> Conflict preemption therefore exists in this context only where the manufacturer can provide "clear evidence" that the FDA would have rejected attempts by the manufacturer to make the change to the label that plaintiffs contend was omitted. *Id*. at 571–72; *Mason*, 596 F.3d at 391.

*In re Testosterone,* 2017 WL 1836435 at *7 (CMO 47 at 16).    Because Auxilium does not even address this general lack of safety and efficacy warning nor the warning concerning a lack of clinical safety trials, Auxilium cannot possibly meet its burden here.

Not only is there a complete lack of record evidence that the FDA would have rejected these warnings, but in fact, the opposite is true.  The FDA ultimately required Auxilium, and other TRT manufactures, to update their label in May 2015 to add the precise warning that Plaintiffs contend should have been added prior to Plaintiffs' injuries: "Safety and efficacy of Testim in men

16

with 'age-related hypogonadism' have not been established (1)." *See* Testim Label, May 2015 Revision, Ex. 6. Accordingly, within two (2) years of Plaintiff Holtsclaw's injury and within one (1) year of Plaintiff Owens' injury, the FDA mandated that Auxilium add the lack of safety and efficacy warning that Plaintiffs contend should have been added. The FDA's action of adding this warning, even after Plaintiffs suffered their injuries, "clearly cut towards making it less likely that the FDA would have rejected the plaintiffs' proposed warning" prior to 2013. *See Mason*, 596 F.3d at 395. This fact alone defeats conflict preemption.

## III. PLAINTIFFS' DESIGN DEFECT CLAIMS ARE NOT PREEMPTED.

Auxilium argues that, under *Mutual Pharm. Co. v. Bartlett,* 133 S. Ct. 2466 (2013), and *Yates v. Ortho-McNeil-Janssen Pharms., Inc.*, 808 F.3d 281 (6th Cir. 2015), Plaintiffs' design-defect claims are preempted. It argues that because the FDA approved the formulation of Testim, Defendants were precluded from offering a different design for the product. *Bartlett* and *Yates* are inapplicable here, however, because Testim was approved by the FDA *only for use in men with classic hypogonadism*. The FDA repeatedly told Defendants that Testim was not approved for age-related declines in serum testosterone levels.[10] Yet, Auxilium marketed Testim precisely for the off-label indication the FDA refused to approve. *See* Pence Report, Ex. 5 at 56-139.

Whether or not the design of Testim is defective when used by men with classic, true hypogonadism, the product is defectively designed for use in men with age-related declines in their testosterone and/or symptoms of aging with which Defendants sought to associate such declines. This is so because there is no evidence that Testim is effective in treating the symptoms for which Defendants promoted the product. When used in this fashion, Testim has absolutely no utility – there is simply no reason to believe it works. With no countervailing benefit, *any* risks are

---

[10] In fact, Auxilium actually sought FDA approval for Testim to treat "age-related hypogonadism" but the FDA did not allow Auxilium to include an indication for this condition in its label. *See* FDA Labeling Revisions #2, Ex. 7; *See also* Pence Report, Ex. 5 at 44-46. Accordingly, Auxilium was not permitted to market its *drug* to men who only had "age-related hypogonadism" as it was not approved to do so and no studies had been conducted to determine safety and efficacy in that population.

unacceptable, even if the risks of the drug might have been outweighed by some benefits in men who suffer from classical hypogonadism. Because Testim increases the risk of major cardiovascular events, it is defectively-designed for treatment of age-related declines in serum testosterone because it exposes men using it for that purpose to risks without any countervailing benefits.

Indeed, Testim may be worse than useless in such men. As set forth in the expert report of Dr. David Handelsman, low serum testosterone may be the result of other age-related conditions, including obesity, type 2 diabetes, metabolic syndrome, and atherosclerotic cardiovascular disease. *See* Plaintiffs' Expert David Handelsman's Report, Ex. 8 at 1. Aging men with these conditions are already at risk for major cardiovascular events. *See* Plaintiffs' Expert Hossein Ardehali's General Causation Report, Ex. 9 at 8. Because Testim can increase the risk of such events, its use may be particularly pernicious in men whose low testosterone levels are a marker that they are already at an increased risk for the same adverse health events. These patients—the very patients to whom Auxilium marketed Testim—are precisely the men who should *not* use Testim. In short, for men who were prescribed Testim and did not suffer from actual primary or secondary hypogonadism, Testim was necessarily defective in its design and it should have never been sold as a product to treat age-related hypogonadism. *See* Pence Report, Ex. 5 at 135-39. This conclusion is in no way at odds with the FDA's approval of the product, because the FDA never approved Testim for this use.

Plaintiffs thus do not argue, and do not need to argue, that Auxilium never should have started, or should have stopped, selling Testim because of its defective design, a theory of liability that some courts have rejected. *See Yates*, 808 F.3d at 300; *but see Young v. Bristol-Myers Squibb Co.,* No. 4:16-CV-00108-DMB-JMV, 2017 U.S. Dist. LEXIS 24730, at *21 (N.D. Miss. Feb. 22, 2017) (stop selling doctrine does not preclude a pre-approval theory of recovery); *Guidry v.*

18

*Janssen Pharms., Inc.*, 206 F. Supp. 3d 1187 (E.D. La. 2016) ([T]the raison d'être of products liability litigation is to penalize manufacturers who design unreasonably dangerous products in hopes that they never start selling them. State products liability law functions as a compliment to federal drug regulations to keep unreasonably dangerous drugs off the market.). Plaintiffs argue instead that Auxilium never should have started, or should have stopped, marketing Testim *for age-related hypogonadism, low serum testosterone levels, and the general symptomology of aging* because Testim is defectively-designed when used for those conditions. Auxilium thus did not need to re-formulate Testim; it needed to stop marketing Testim for conditions for which its design was inherently defective.

This theory is in no way at odds with the FDA's approval of Testim for use in men with classic hypogonadism nor would Auxilium have been in violation of any federal law obligations had it ceased promoting Testim for the off-label described herein. This Court should find that Plaintiffs' defective design claims are not preempted because these claims turn on showing that Testim is defectively-designed only in the context of the off-label uses for which Defendants marketed it and because those uses were never approved by the FDA.

## CONCLUSION

In light of the above, Auxilium's motion for summary judgment on the ground that Plaintiffs' failure-to-warn and design-defect claims are preempted should be denied in its entirety. Dated: October 2, 2017

                                    Respectfully submitted,

                                  */s/ Trent B. Miracle*
                                  Trent B. Miracle
                                  SIMMONS HANLY CONROY
                                  One Court Street
                                  Alton, IL 62002
                                  Phone: (618) 259-2222
                                  Fax: (618) 259-2252
                                  Email: tmiracle@simmonsfirm.com

Ronald Johnson, Jr.
SCHACHTER, HENDY & JOHNSON PSC
909 Wrights Summit Parkway, Suite 210
Ft. Wright, KY 41011
Phone: (859) 578-4444
Fax: (859) 578-4440
Email: rjohnson@pschacter.com

Christopher A. Seeger
SEEGER WEISS LLP
77 Water Street
New York, NY 10005
Phone: (212) 584-0700
Fax: (212) 584-0799
Email: cseeger@seegerweiss.com

Plaintiffs' Co-Lead Counsel *on behalf of* Plaintiffs'
Steering Committee

**CERTIFICATE OF SERVICE**

I hereby certify that on October 2, 2017, I electronically transmitted the foregoing document to the Clerk of the United States District Court using the CM/ECF system for filing and service to all parties/counsel registered to received copies in this case.

*/s/ Brendan A. Smith*
Brendan A. Smith

Dated: October 2, 2017