# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| IN RE: TESTOSTERONE REPLACEMENT THERAPY PRODUCTS LIABILITY LITIGATION )<br>)<br>)<br>) | |
| ) | Case No. 1:14-cv-1748 |
| This Document Relates To: ) | MDL No. 2545 |
| ) | |
| Holtsclaw v. Endo Pharmaceuticals, Inc., et al.<br>Case No. 1:15-cv-3941 )<br>)<br>) | |
| Owens v. Auxilium Pharmaceuticals, Inc.<br>Case No. 1:14-cv-5180 )<br>)<br>) | |

## DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION TO EXCLUDE EXPERT TESTIMONY UNDER FEDERAL RULES OF EVIDENCE 702 AND 403

Andrew K. Solow (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
Phone: (212) 836-7740
Fax: (212) 836-6776
Email: andrew.solow@apks.com

Pamela J. Yates (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844
Phone: (213) 243-4178
Fax: (213) 243-4199
Email: pamela.yates@apks.com

***Attorneys for Endo Pharmaceuticals Inc. and Auxilium Pharmaceuticals, LLC (f/k/a Auxilium Pharmaceuticals, Inc.)***

64825894

**TABLE OF CONTENTS**

Page

I. DR. ARDEHALI'S SPECIFIC CAUSATION OPINION REGARDING MR. HOLTSCLAW IS INADMISSIBLE ................................................................................ 1

II. DR. ABBAS'S SPECIFIC AND GENERAL CAUSATION OPINIONS REGARDING MR. OWENS ARE INADMISSIBLE ....................................................... 6

    A. Dr. Abbas's Specific Causation Opinion is Predicated on Unreliable Temporal Association, Not A Reasonable Inference From Virchow's Triad ........ 6

    B. Undisputed Testimony From Mr. Owens Demonstrates Dr. Abbas's Specific Causation Opinion is Premised on Incorrect Assumptions About Mr. Owens's Testim Usage ................................................................................ 8

    C. General Causation: Dr. Abbas's Selective Cherry-Picking of Supportive Studies Does Not Satisfy Daubert ........................................................................ 11

III. THE CAUSATION OPINIONS OFFERED BY TREATING PHYSICIANS DRS. CAGATA AND OZOR ARE INADMISSIBLE ...................................................... 12

IV. THE OPINIONS OF DRS. PENCE, WOLOSHIN AND HANDELSMAN CONCERNING MOTIVE, INTENT, KNOWLEDGE, DISEASE MONGERING ADVERTISING AND MARKETING ARE INADMISSIBLE ........................................ 13

    A. Dr. Pence ............................................................................................................. 13

    B. Dr. Woloshin ...................................................................................................... 14

    C. Dr. Handelsman ................................................................................................. 15

CONCLUSION ............................................................................................................................ 15

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Cooper v. Carl A. Nelson & Co.*,
    211 F.3d 1008 (7th Cir. 2000) .................................................................................................7, 8

*In re Bextra & Celebrex Mktg. Sales Practices & Prods. Liab. Litig.*,
    524 F. Supp. 2d 1166 (N.D. Cal. 2007) ......................................................................................12

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig.*,
    174 F. Supp. 3d 911 (D.S.C. 2016) .............................................................................................12

*In re Rezulin Prods. Liab. Litig.*,
    309 F. Supp. 2d 531 (S.D.N.Y. 2004) .........................................................................................14

*In re Rezulin Prods. Liab. Litig.*,
    369 F. Supp. 2d 398 (S.D.N.Y. 2005) .........................................................................................11

*In re Testosterone Replacement Therapy Prods. Liab. Litig.*,
    No. 14 C 1748, 2017 WL 1833173 (N.D. Ill. May 8, 2017) ..............................................1, 11

*In re Testosterone Replacement Therapy Prods. Liab. Litig.*,
    No. 14 C 1748, 2017 WL 1836443 (N.D. Ill. May 8, 2017) ...................................................15

*In re Testosterone Replacement Therapy Prods. Liab. Litig.*,
    No. 14 C 1748, 2017 WL 2313201 (N.D. Ill. May 29, 2017) .................................................14

*In re Trasylol Prods. Liab. Litig.*,
    709 F. Supp. 2d 1323 (S.D. Fla. 2010) ......................................................................................13

*Tillman v. C.R. Bard, Inc.*,
    96 F. Supp. 3d 1307 (M.D. Fla. 2015) .......................................................................................13

*Tyree v. Bos. Sci. Corp.*,
    54 F. Supp. 3d 501 (S.D. W. Va. 2014) .....................................................................................12

*Westberry v. Gislaved Gummi AB*,
    178 F.3d 257 (4th Cir. 1999) ..................................................................................................7, 8

**Rules**

Fed. R. Civ. P. 26 ...............................................................................................................................12

Fed. R. Evid. 403 ........................................................................................................................1, 15

Fed. R. Evid. 702 ...............................................................................................................................12

I. **DR. ARDEHALI'S SPECIFIC CAUSATION OPINION REGARDING MR. HOLTSCLAW IS INADMISSIBLE**

The parties agree that "[d]ifferential etiology is an accepted method for establishing specific causation," and that methodology "does not require an expert to rule out every alternative cause." Plaintiffs' Steering Committee's Memorandum of Law in Opposition to Motion of Auxilium Defendants to Exclude Testimony Under Federal Rules of Evidence 702 and 403 (*Holtsclaw* ECF No. 60; *Owens* ECF No. 56) ("Pls.' Opp.") at 20. However, "[t]he expert 'must provide a reasonable explanation as to why he or she has concluded that [any alternative cause suggested by the defense] was not the sole cause of the plaintiff's injury.'" *Id*. As this Court has held, "[a]n expert is not required to rule out every alternative cause. . . . But where reasonable alternative causes exist, the expert should explain why he does not believe the alternatives were the sole cause of the plaintiff's injury." *In re Testosterone Replacement Therapy Prods. Liab. Litig.*, No. 14 C 1748, 2017 WL 1833173, at *17 (N.D. Ill. May 8, 2017) ("CMO 46").

In the case of Mr. Holtsclaw, Dr. Ardehali has **not** provided a reasonable explanation as to why the combination of his poorly controlled diabetes, untreated high cholesterol and obesity were not the sole cause of Mr. Holtsclaw's heart attack. The "twins" hypothetical question exposes this fatal flaw in Dr. Ardehali's methodology. This evidence was not before the Court when it previously considered Dr. Ardehali's specific causation opinion in the AbbVie (Mitchell) case. *See* CMO 46, at *20.

Dr. Ardehali testified that if he treated a 59-year-old man just like Mr. Holtsclaw with a history of obesity, diabetes, hyperlipidemia, and no testosterone use, who presented with a heart attack, he "would tell this patient that he has multiple risk factors for coronary disease and those

risk factors contributed to his heart attack." Ardehali Dep. (Defs.' Mem.[1] Ex. 1) at 134:24–135:7. But if he treated the man's twin brother with the identical medical history except that he had been taking Testim for seven months prior to his heart attack (*i.e.*, Mr. Holtsclaw), he would diagnose the cause of the heart attack as Testim. *Id.* at 139:19–140:1. More generally, in Dr. Ardehali's opinion, "if there is a patient who has . . . the background of having higher risk of a heart attack, and they are put on Testim . . . and they have a heart attack within a few months and then you do a cath[eterization] and you find a clot, I would say Testim caused it," even though Dr. Ardehali conceded that a clot often is observed on catheterization of patients who experience heart attacks in the absence of testosterone use. *Id.* at 139:19–140:1, 153:7–18.

Plaintiffs claim that Dr. Ardehali disputed the premise of the twins hypothetical because "[n]o two people are exactly the same." Pls.' Opp. at 24 (emphasis omitted). But the hypothetical question that Dr. Ardehali answered was expressly predicated on the assumption that the twins are exactly the same but for testosterone use, and Dr. Ardehali was unable to articulate any basis for differing causal assessments:

> Q. Now, **suppose his twin brother has exactly the same medical conditions except that he also used Testim**. What would the cause of the brother's heart attack be?
>
> A. Again, I need a lot more information than that, than having, you know, discussing a twin brother. I need more information.
>
> Q. What information—what additional information do you need?
>
> A. I need to know that twin brother's past medical history.
>
> . . . .
>
> Q. Identical. Everything is identical. **Everything is 100% identical except the twin brother used Testim**.

---

[1] Defendants' Motion and Memorandum of Law in Support of Motion to Exclude Expert Testimony Under Federal Rules of Evidence 702 and 403 (*Holtsclaw* ECF No. 39; *Owens* ECF No. 34).

A.    I need to know what was found on the cath.

. . . .

Q.    Same findings as the first man that you saw who you said multiple risk factors contributed.

A.    I need to know when the patient started taking Testim.

Q.    Seven months prior to the heart attack.

A.    So, the question is what caused his heart attack in the twin brother?

Q.    Yes.

A.    I would say it was caused by Testim if a clot is formed . . . or is found. Sorry.

Q.    What methodology do you use to determine that Testim caused the heart attack of the brother who used Testim and multiple other risk factors caused the heart attack of the brother who didn't use Testim?

A.    Right. So, this patient was started on Testim, didn't have a heart attack, had the risk factors, right, but didn't have a heart attack and was started on Testim. Within a few months he has a heart attack and his heart attack was caused by a blood clot formation.

Q.    But his—but his twin brother with the exact same medical history never used Testim and he also had a heart attack. . . . **Why do you attribute the cause in the brother who used Testim, why do you attribute his cause to Testim and the brother who didn't use Testim you attribute his heart attack to his underlying combined risk factors?**

A.    **Sure. I think the problem here is that you are, you know, you are looking at a complex process and you are trying to make that simplified in terms of one person versus the twin brother. No two people are exactly the same, and that's I think what you're trying to do here, to say there is one person and there is a twin brother and they both had a heart attack and one was on Testim, the other one wasn't.**

That's—that doesn't mean that they were both undergoing the same biological processes in their body.

All I can tell you is that if someone has risk factors, and that's exactly the same—the patient who should not be on Testim. You put that patient on Testim, a few months later, he has a heart attack and there is a clot that has formed and you found on the cath, I would say that was caused by Testim.

64825894                                      3

> **Q.     But what methodology do you use to say that that same exact clot would not have formed absent the Testim use because that's precisely what happened to his brother who did not use the Testim? . . . Tell me the scientific methodology that you use to distinguish those two cases.**
>
> **A.     Sure.  That people are different.  You are trying to simplify the complex human body and the complex process of a heart attack by comparing a brother to his twin brother.  And that is not—that's not a good comparison.**
>
> **Q.     So, any time you see a heart attack in a person that used Testim, you would conclude that the Testim was a cause of the heart attack, if I understand?**
>
> **A.     No.  What I'm saying is that if there is a patient who has the substrate, has the background of having higher risk of a heart attack, and they are put on Testim—I'm sorry—they are put on Testim and they have a heart attack within a few months and then you do a cath and you find a clot, I would say Testim caused it.**

Ardehali Dep. (Defs.' Reply Mem. Ex. 1) at 135:14-140:1 (emphasis added).

In the above-quoted testimony, Dr. Ardehali pointed to the presence of a clot on the catheterization as the key relevant factor in his differential etiology.  But in the hypothetical, both twins had the same clot on the catheterization so that is not a difference in the hypothetical.  Much more importantly, Dr. Ardehali conceded that the presence of a clot did not specifically implicate Testim because a clot (thrombus) is commonly found on catheterization examination when patients present with a heart attack, and it does not differentiate a testosterone-induced heart attack from a heart attack caused by diabetes, high cholesterol and obesity:

> Q.     But any time you find a 59-year-old man with obesity, hyperlipidemia and diabetes and no testosterone use, you can find a heart attack with [fresh] thrombus, correct?
>
> A.     You may find that, that's correct.
>
> Q.     And if you saw that patient walk into your hospital, you would not write it up as a case report in the medical literature and say, "Gee, this has never been seen before," would you?
>
> A.     I would not, no.

64825894                                                     4

> Q. Because you see that every day of the week, correct?
>
> A. You see those cases.
>
> Q. And now that same patient with those risk factors comes in except that he has used Testim for seven months and now you are going to say that the cause of the fresh thrombus and the heart attack is Testim, correct?
>
> A. That's correct.

Ardehali Dep. (Defs.' Mem. Ex. 1) at 140:9–141:3.

Dr. Ardehali's bottom line opinion is that: "if there is a patient who has . . . the background of having higher risk of a heart attack, and they are put on Testim . . . and they have a heart attack within a few months and then you do a cath[eterization] and you find a clot, I would say Testim caused it." *Id.* at 139:19–140:1. This opinion was confirmed in another TRT deposition of Dr. Ardehali taken just a few days ago:

> Q. So any patient who walks into your office, tells you they had a heart attack and they used a testosterone product beforehand, you are pretty much going to conclude that the heart attack was caused by the testosterone?
>
> A. I'm going to tell them that was a major contributing factor and it has happened before, and I tell them do not take this product ever again."

Ardehali (9/29/17) Dep. (Defs.' Reply Mem. Ex. 2) at 159:9–16.

In other words, in Dr. Ardehali's view, because Testim **can** cause a heart attack in men with risk factors who present with a clot, Testim **is** a cause of every such heart attack. That is not a proper application of differential etiology because identical heart attacks commonly occur absent Testim use and he has no methodology for distinguishing between the two. His specific causation opinion is therefore inadmissible.

## II. DR. ABBAS'S SPECIFIC AND GENERAL CAUSATION OPINIONS REGARDING MR. OWENS ARE INADMISSIBLE

### A. Dr. Abbas's Specific Causation Opinion is Predicated on Unreliable Temporal Association, Not A Reasonable Inference From Virchow's Triad

Mr. Owens had a DVT in December 2004, several years **before** he ever used Testim, and he had a **second** DVT in July 2013, **subsequent** to using Testim. Abbas Dep. (Defs.' Reply Mem. Ex. 3) at 55:13–23; *see also* Abbas Dep. (Defs.' Mem. Ex. 4) at 138:12–14. Plaintiffs' expert, Dr. Abbas, claims that the second DVT was caused by Testim, but the only basis Dr. Abbas has for linking the second DVT to Testim is temporal association (the second DVT occurred subsequent to Testim use).

In their opposition papers, Plaintiffs assert Dr. Abbas's causation opinion is predicated on more than temporality, arguing that his opinion is based on reasoning from "Virchow's Triad":

> [Dr. Abbas's] conclusion was based in substantial part on "Virchow's Triad," three factors that contribute to thrombosis: hypercoagulability, endothelial injury, and stasis. As Dr. Abbas explained, Mr. Owens's prior DVT resulted in endothelial injury and his stroke reduced his mobility, resulting in stasis. Thus, according to Dr. Abbas, Mr. Owens already had two of three causal factors for DVT under Virchow's Triad. He had had these two factors for years without incident, and then something changed: he began using Testim. As Dr. Abbas explained, testosterone, both by its effect on platelets and by its aromatization into estradiol, causes hypercoagulability. This added the third factor of Virchow's Triad, thus completing the cycle. This is not mere temporality – it is a reasoned analysis, grounded in the well-established science of Virchow's Triad.

Pls.' Opp. at 27 (citations omitted). This argument is contradicted by three undisputed facts, each of which independently negates Plaintiffs' contention.

First, the assertion that Mr. Owens had "two of three causal factors for DVT under Virchow's Triad . . . for years without incident" is incorrect. As Dr. Abbas conceded, Mr. Owens had a DVT in December 2004 which demonstrates that the full trio (not merely two) of the pathophysiological factors under Virchow's Triad were present long before Mr. Owens started using Testim. Abbas Dep. (Defs.' Reply Mem. Ex. 3) at 55:13–23.

Second, as Dr. Abbas acknowledged, Mr. Owens used Testim several times subsequent to his first DVT but prior to July 2013, and he did not experience a DVT associated with those uses. Abbas Dep. (Defs.' Mem. Ex. 4) at 178:11–23. The fact that Mr. Owens used Testim without incident subsequent to the first DVT and prior to the second DVT demonstrates that Testim was not a triggering exposure that "complet[ed] the cycle" of Virchow's Triad. If Testim were the exposure that "complet[ed] the cycle," the DVT would have occurred earlier, during the Testim uses prior to July 2013. In addition, subsequent to his second DVT, Mr. Owens has been using "Ageless Male" to increase his testosterone; his use of that product has been without incident further confirming that TRT is not a triggering exposure. I. Owens Dep. (Defs.' Reply Mem. Ex. 4) at 260:12–261:23.

Third, Dr. Abbas conceded that there is no evidence that Testim had any effect on Mr. Owens's platelet or estradiol or in any way contributed to hypercoagulability. Abbas Dep. (Defs.' Mem. Ex. 4) at 133:20–134:12 (no evidence that Mr. Owens had elevated estradiol levels when he was diagnosed with DVT), 135:15–136:12 (Mr. Owens did not have elevated hematocrit or hemoglobin levels when he was diagnosed with DVT), 138:15–21(same), 142:8–13 (no evidence that Mr. Owens had elevated thromboxane A2 levels when he was diagnosed with DVT).

In sum, in the case of Mr. Owens DVT and Testim, Virchow's Triad is a three-legged stool with no legs. It offers no additional support for Dr. Abbas's opinion beyond simple temporality.

Plaintiffs' reliance on *Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008 (7th Cir. 2000) and *Westberry v. Gislaved Gummi AB*, 178 F.3d 257 (4th Cir. 1999) is misplaced. In *Cooper*, the issue was not the temporal relationship of the alleged cause of the injury, which was "chronic

pain syndrome." 211 F.3d at 1019. The issue was whether plaintiff's chronic pain syndrome had been caused by a work accident. And, "the question considered by the court [was] the propriety of reliance on [the plaintiff's] statements to the [experts] in determining causation." *Id.* The defendant said that the expert should not have relied on the plaintiff who the defendant claimed lied about the alleged injury-producing event and about his lack of pain preceding the event. The Court found that was fodder for cross-examination, but it was acceptable for the expert to rely on plaintiff self-reporting. *Id*. at 1021. That is not the issue here.

*Westberry* also is distinguishable. In that case, the Court acknowledged that "the mere fact that two events correspond in time does not mean that the two necessarily are related in any causative fashion." 178 F.3d at 265. Moreover, the expert did not rely solely on the temporal relationship. He also relied on the fact that the plaintiff's sinus condition improved when he was not exposed to talc at work and "considered and excluded other potential causes for Westberry's sinus disease." *Id.* at 265–66.

In short, Dr. Abbas's specific causation opinion is not supported by Virchow's Triad. Rather, temporal association is the linchpin of the opinion and, as demonstrated in Defendant's initial memorandum, that is scientifically and legally insufficient. Defs.' Mem. at 12–15.

    **B.    Undisputed Testimony From Mr. Owens Demonstrates Dr. Abbas's Specific Causation Opinion is Premised on Incorrect Assumptions About Mr. Owens's Testim Usage**

Dr. Abbas's specific causation opinion is inadmissible for the separate and independent reason that he failed to account for crucial facts regarding Mr. Owens's misuse of Testim resulting in sub-therapeutic dosing.

Dr. Abbas's opinion that Testim caused Mr. Owens's DVT is based on his erroneous belief that Mr. Owens was using the full recommended dose. Abbas Dep. (Defs.' Mem. Ex. 4) at 165:9–24. Dr. Abbas was unaware that Mr. Owens was using only one-third to one-half of the

recommended Testim dose. *Id.* at 166:6–168:11 ("According to what I remember I reviewed is that he was taking a full dose that he was prescribed at that time."). He was also unaware that Mr. Owens misapplied Testim so as to further reduce the effective dose. *Id.* at 156:17–24. Finally, Dr. Abbas conceded that he lacked evidence that a sub-therapeutic dose, that was misapplied, could result in hypercoagulability or contribute to DVT. *Id.* at 160:4–18.

In their opposition, Plaintiffs claim that the amount of Testim used by Mr. Owens is a disputed fact issue for the jury to determine. But Mr. Owens's sworn deposition testimony that he was using only one-third to one-half of the recommended dose (an entire tube a day) – and that he was misapplying the product– is clear, unequivocal, uncontradicted, and repeated multiple times:

> Q. And so, were you using the whole tube or less than an entire tube?
>
> A. Less than an entire tube.
>
> Q. Okay. So if you were to squeeze it out into your hand, would it be, say, the size of a quarter? Size of a half dollar? How would you—
>
> A. Probably about the size of a dime.
>
> . . . .
>
> Q. Is that what you did, Mr. Owens? Did you use all of the Testim in the tube?
>
> A. No, I did not.
>
> Q. You only used a small dime-sized amount from the tube?
>
> A. Yes, that's—that's correct.
>
> Q. How many days would a tube last you?
>
> A. Two, approximately three days, possibly.
>
> . . . .
>
> Q. Okay. And the dime-sized amount, is that—every time you applied Testim, is that how much you would apply?

> A. Yes.
>
> Q. So on average, one tube of Testim would last you about three days; is that right?
>
> A. That's correct.
>
> . . . .
>
> Q. Okay. And it—and it's—you would agree with me that you were not applying the amount that is instructed in the medication guide, correct?
>
> A. That's correct.
>
> Q. Okay. So, you were actually [applying] . . . less Testim than you ought to have been, correct?
>
> A. Yes.

I. Owens Dep. (Defs.' Mem. Ex. 6) at 192:15–21, 198:17–24, 199:19–200:1, 203:10–16.

Not only was Dr. Abbas unaware that Mr. Owens was using only one-third to one-half of the prescribed dose, he also was unaware that Mr. Owens was applying the gel to the wrong part of the body, which further reduced the effective dose. Abbas Dep. (Defs.' Mem. Ex. 4) at 157:16–158:15; *see also* Defs.' Mem. Ex. 8 at 2606–07.

Plaintiffs contend that Mr. Owens reported to Dr. Smith that he was using less than the recommended dose and applying it to the wrong part of his body, and that Dr. Smith then instructed him about using the full tube and applying it to the appropriate area. Pls.' Opp. at 30. But that contention is squarely contradicted by Dr. Smith's testimony. *E.g.*, D. Smith Dep. (Defs.' Reply Mem. Ex. 5) at 39:18–41:22 ("Q. Did he report to you that he was applying the product to his thighs and abdomen? A. No. . . . Q. Okay. Did he report to you that he was using only a dime-size amount such that a tube would last two to three days? A. No."). There is no evidence that Mr. Owens reported to Dr. Smith that he was using a sub-therapeutic dose or that he was incorrectly applying Testim to his thighs or abdomen.

Dr. Abbas conceded that he did not know what dose of Testim was needed to increase DVT risk. Abbas Dep. (Defs.' Mem. Ex. 4) at 161:15–20 ("Q. Do you have an opinion on what dose of Testim a person needs to increase the risk of DVT? A. No."). And he further conceded that he could not opine whether Testim can cause DVT when the medication was misapplied by Mr. Owens. *Id*. at 160:4–18 ("Q. So do you have an opinion as to whether Testim can present an increased risk of DVT if it's wrongfully applied to non-indicated portions of the body? A. I suppose not. I do not have the information about the application site versus the hypercoagulability.").

In short, Dr. Abbas was unaware of critical facts regarding Mr. Owens's under-dosing and misapplication of Testim, and he has no scientific basis to claim that Mr. Owens's sub-therapeutic dose of Testim—that was misapplied—could have made him hypercoagulable or contributed to his DVT.

    **C.**    **General Causation: Dr. Abbas's Selective Cherry-Picking of Supportive Studies Does Not Satisfy Daubert**

"[A]ny theory that fails to explain information that otherwise would tend to cast doubt on that theory is inherently suspect," and "courts have excluded expert testimony 'where the expert selectively chose his support from the scientific landscape.'" *In re Rezulin Prods. Liab. Litig.*, 369 F. Supp. 2d 398, 425 & n.164 (S.D.N.Y. 2005) (citation omitted).

Here, it is undisputed that Dr. Abbas did not undertake a systematic review of all of the medical literature relevant to VTE risk. As this Court has noted, there are "four epidemiological studies addressing TRT and VTEs." CMO 46, at *15. Three of them—"the Sharma, Li, and Baillargeon studies—found no statistically significant association" between TRT medicines and VTE. *Id*. Only one of them—the Martinez study—"found a statistically significant association between VTE and any subgroup of VTE users." *Id*. Dr. Abbas did not discuss the Sharma, Li,

or Baillargeon studies in his Report. He did not even review the Sharma study until *after* he submitted his Report and had formed his opinions, and did not review the Li study until he was confronted with it at his deposition. Abbas Dep. (Defs.' Reply Mem. Ex. 3) at 144:12–145:5, 205:22–207:8; Abbas Dep. (Defs.' Mem. Ex. 4) at 149:3–11, 149:19–22, 150:11–21, 152:4–9.

Accordingly, Dr. Abbas's opinion should be excluded. *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig.*, 174 F. Supp. 3d 911, 930 (D.S.C. 2016) (excluding expert opinion where "Plaintiffs have made no showing whatsoever that [the expert] performed any search to obtain relevant literature, rather than cherry-picking studies that supported his conclusion"); *Tyree v. Bos. Sci. Corp.*, 54 F. Supp. 3d 501, 520–21 (S.D. W. Va. 2014) (excluding testimony where expert rejected peer-reviewed literature contrary to his opinion "without a scientific basis for doing so"); *In re Bextra & Celebrex Mktg. Sales Practices & Prods. Liab. Litig.*, 524 F. Supp. 2d 1166, 1176 (N.D. Cal. 2007) (excluding expert testimony where expert "reache[d] his opinion by first identifying his conclusion . . . and then cherry-picking observational studies that support his conclusion and rejecting or ignoring the great weight of the evidence that contradicts his conclusion").

Dr. Abbas's failure to adhere to the standards required of all expert witnesses is not excused by Plaintiffs' description of him as an "inexperienced expert." Pls.' Opp. at 32 n.8.

### III. THE CAUSATION OPINIONS OFFERED BY TREATING PHYSICIANS DRS. CAGATA AND OZOR ARE INADMISSIBLE

Opinion testimony offered by treating physicians must satisfy the same Rule 702/*Daubert* standard as any other expert witness. They must have a reliable method for reaching their conclusions. Designating Drs. Cagata and Ozor as experts under Rule 26 does not make the testimony admissible expert testimony absent a reliable methodology. Here, neither Dr. Cagata

nor Dr. Ozor has a reliable methodology and their causation opinions are therefore inadmissible.

Defs.' Mem. at 23–25.

### IV. THE OPINIONS OF DRS. PENCE, WOLOSHIN AND HANDELSMAN CONCERNING MOTIVE, INTENT, KNOWLEDGE, DISEASE MONGERING ADVERTISING AND MARKETING ARE INADMISSIBLE

#### A. Dr. Pence

Plaintiffs claim that Dr. Pence is opining about Auxilium's "knowledge," not its "intent":

> ". . . Dr. Pence is not speculating about what Auxilium intended, but rather about what Auxilium knew. **Unlike a party's subjective intent, about which an expert may lack a basis to testify, knowledge may be determined objectively from the documentary record.**" Pls.' Opp. at 10 (emphasis added).

This is a distinction without a difference.

Dr. Pence has no specialized expertise in divining Auxilium's "knowledge . . . objectively from the documentary record." Moreover, there is no reason why the jury cannot consider that objective "documentary record" without Dr. Pence's spin. Dr. Pence's proffered testimony is improper and should be excluded for the same reason as the regulatory expert in *In re Trasylol Prods. Liab. Litig.*, 709 F. Supp. 2d 1323, 1346 (S.D. Fla. 2010) (emphasis added):

> [W]hile the Report cites to some FDA regulations, it mostly consists of a factual narrative of Trasylol's regulatory history and summaries of Bayer's internal documents. **[The expert] does not analyze the facts; she, in the words of the *Prempro* court, regurgitates them and reaches conclusory opinions that are purportedly based on these facts. These facts should be presented to the jury directly; [the expert] assumes the role of Plaintiffs' advocate in her presentation of the facts and invades the province of the jury**. In addition to restating the facts, [the expert] makes conclusory opinions regarding Bayer's and the FDA's state of mind and knowledge based on her reading of internal Bayer documents and FDA correspondence. **The jury can infer intent from this evidence directly: . . . an FDA expert, is neither able nor allowed to assist the jury in this regard.**[2]

---

[2] *Accord Tillman v. C.R. Bard, Inc.*, 96 F. Supp. 3d 1307, 1327 (M.D. Fla. 2015) (excluding expert testimony based on a company document that "'Bard was fully aware that its claims . . . were false, misleading and reckless'" because it was "unhelpful in that a jury is fully capable of drawing its own inferences from this memorandum without assistance from an expert"); *In re*

64825894      13

B.   Dr. Woloshin

Dr. Woloshin's opinion that Auxilium engaged in "disease mongering," is based on "examples, citations, and quotes from the vast body of corporate depositions, corporate documents, and other sources that were reviewed during the preparation of this report." Defs.' Mem. Ex. 26 at ¶ 64. The Court should exclude Dr. Woloshin's opinions for the same reasons that the Court should exclude the duplicative opinions of Drs. Pence and Handelsman.

In their opposition, Plaintiffs contend that Dr. Woloshin should be able to offer opinions about marketing conducted by the pharmaceutical industry generally, and by other manufacturers, based on Dr. Woloshin's citation of one Auxilium internal email noting that AbbVie's marketing might result in patients visiting doctors for hypogonadism evaluation which, in turn, could result in increased sales of Testim. Pls.' Opp. at 18–19. Notably, there is no assertion that Auxilium participated in the creation or dissemination of such marketing material by AbbVie. This isolated email observation is not a basis to open the door to wide-ranging opinion testimony about other manufacturers' marketing. As the Court has previously held in the AbbVie cases, such evidence is inadmissible:

> Evidence regarding other manufacturers of TRT has similar potential for confusion or unfair prejudice. Other manufacturers' TRT products have different marketing and regulatory histories, and thus testimony or other evidence about those products may be misleading unless it is placed in the proper context. Establishing that context would take up a significant amount of time and would also be unfairly prejudicial to AbbVie, as plaintiffs have access—through discovery with other defendants in the MDL—to information about other TRT manufacturers that AbbVie lacks.

*In re Testosterone Replacement Therapy Prods. Liab. Litig.*, No. 14 C 1748, 2017 WL 2313201, at *3 (N.D. Ill. May 29, 2017).

---

*Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004) (excluding expert testimony where "plaintiffs' experts propose improperly to assume the role of advocates for the plaintiffs' case by arguing as to the intent or motives underlying the conduct of Warner-Lambert or others").

Finally, with respect to Dr. Woloshin's pejorative adjectives such as "disease-mongering" and "mass uncontrolled experiment," the Court has previously ruled that such terms are precluded. *In re Testosterone Replacement Therapy Prods. Liab. Litig.*, No. 14 C 1748, 2017 WL 1836443, at *17, *19 (N.D. Ill. May 8, 2017). Plaintiffs say that they "respectfully disagree with the Court's ruling, but agree that, under that ruling, the same language is excluded here." Pls.' Opp. at 19. Accordingly, this issue is resolved and Defendants respectfully request that it be reflected in an Order.

### C. Dr. Handelsman

In their opposition, Plaintiffs expressly represent that "Neither Plaintiff Holtsclaw no[r] Plaintiff Owens intends to offer any opinions from Dr. Handelsman pertaining to marketing, advertising, or over-promotion." Pls.' Opp. at 19. Accordingly, this issue is resolved and Defendants respectfully request that it be reflected in an Order.

### CONCLUSION

For the foregoing reasons and for the reasons set forth in Defendants' initial memorandum, the Court should exclude the proposed testimony of Plaintiffs' experts described above under Federal Rule of Evidence 702 and 403.

Dated: October 10, 2017  Respectfully submitted,

/s/ Andrew K. Solow
Andrew K. Solow (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
Phone: (212) 836-7740
Fax: (212) 836-6776
Email: andrew.solow@apks.com

Pamela J. Yates (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844

Phone:  (213) 243-4178
Fax:  (213) 243-4199
Email:  pamela.yates@apks.com

***Attorneys for Endo Pharmaceuticals Inc. and Auxilium Pharmaceuticals, LLC (f/k/a Auxilium Pharmaceuticals, Inc.)***

64825894

16

## CERTIFICATE OF SERVICE

I, Andrew K. Solow, certify that on October 10, 2017, I served a true and correct copy of the foregoing Defendants' Reply Memorandum of Law in Further Support of Motion to Exclude Expert Testimony Under Federal Rules of Evidence 702 and 403 on counsel of record by electronic notice through the CM/ECF system of the United States District Court for the Northern District of Illinois.

Dated: October 10, 2017

*Andrew K. Solow*
Andrew K. Solow (*pro hac vice*)

64825894